**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>MADISON SQUARE BOYS & GIRLS CLUB, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 22-10910 (___) |

**DECLARATION OF JEFFREY DOLD (I) IN SUPPORT OF FIRST DAY
MOTIONS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

JEFFREY DOLD, being duly sworn, states the following under penalty of perjury:

1.      I am the Chief Financial Officer of Madison Square Boys & Girls Club, Inc. ("Madison").  I have held this position since July 2014 and am familiar with the assets, liabilities, and operations of Madison.

2.      On June 29, 2022 (the "Petition Date"), Madison filed a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code") commencing this chapter 11 case.  As further described herein, on the Petition Date, Madison filed certain motions and pleadings seeking various types of "first-day" relief  (each, a "First Day Motion" and, collectively, the "First Day Motions") requesting necessary operational and procedural relief to allow Madison to continue to operate and fulfill its charitable mission in the ordinary course.  I have reviewed each of the First Day Motions and am familiar with their contents.  I respectfully submit that all of the First Day Motions are vital to Madison's reorganization efforts and that expedited approval of the First Day Motions is important to Madison's successful reorganization.

---

[1]     The last four digits of the Debtor's federal tax identification number are 6792.  The Debtor's mailing address is 250 Bradhurst Avenue, New York, New York 10039.

3.      I make this Declaration based upon (a) my personal knowledge of certain facts stated herein, (b) information provided to me by others associated with Madison, (c) my review of relevant documents, and (d) my experience and knowledge of Madison's operations.  If I were called to testify, I would testify as to the facts as set forth herein.  I am authorized by Madison to submit this Declaration.

**Preliminary Statement**

4.      For over 100 years since its founding in 1884, Madison has provided a safe, stable, and supportive environment for thousands of young people in New York City's most underserved and under-resourced communities.  Today, Madison offers life-changing educational, recreational, and mentorship services at six (6) clubhouses in the Bronx, Brooklyn, and Harlem and provides continuing support with college and university scholarships.  Madison's role in the lives of children and their families who need a source of community, a resource for guidance and security, and a vehicle for connecting with opportunity is immeasurable and continues to be as critical today as it was more than a century ago.

5.      Despite Madison's substantial success as a non-profit and its positive contribution to thousands of New York City youths annually throughout its history, Madison's mission and future are now in jeopardy due to its inability to litigate or otherwise resolve approximately 140 pending sexual abuse claims by former members against individuals employed by, or volunteering at, Madison at various times from the 1940s to the 1980s.  Madison is devastated to learn of even one alleged incident, as crimes of abuse run counter to everything the organization stands for; no harm should come to any child under any circumstance.

6.      Madison filed this chapter 11 case to provide a forum to address those claims fairly and equitably, and ensure that claimants have access to a fair and equitable resolution.  Madison

2

has attempted, for over a year, to facilitate a resolution outside of chapter 11, but has been unsuccessful, largely due to difficulty getting all significant stakeholders—including Madison's litigation co-defendants and insurers—to the bargaining table.

7.     Madison's current board of directors (the "Board") and management team became aware of the allegations of abuse in 2018, after Rockefeller University ("Rockefeller") retained the law firm of Debevoise & Plimpton LLP ("Debevoise") to initiate an investigation into the conduct of Dr. Reginald Archibald.  Dr. Archibald was a long-time pediatric endocrinologist at Rockefeller who also did volunteer work as a physician at Madison, where he recruited some of its members as patients and participants for research studies at Rockefeller, from the early 1940s to the 1980s.

8.     In October 2018, *The New York Times* published an article describing Dr. Archibald's history of sexual misconduct at Rockefeller.  Shortly thereafter, Madison retained counsel regarding potential claims relating to Dr. Archibald.  In May 2019, Rockefeller made public Debevoise's report of its findings (the "Debevoise Report"),[2] which detailed significant and widespread failures at Rockefeller to respond appropriately to clear signs of Dr. Archibald's misconduct, including the issuance of a grand jury subpoena by the New York District Attorney's Office for medical records of Dr. Archibald's patients.  While the Debevoise Report concedes that Rockefeller's then-president was aware of the investigation, and that Rockefeller's Physician-in-Chief from 1960 to 1974 found Dr. Archibald's conduct "questionable," Madison's Board, for its part, was not aware of any of the facts set forth in the Debevoise Report until the report was issued publicly.

---

[2]     Debevoise & Plimpton LLP, Report on the Investigation of Dr. Reginald Archibald (May 23, 2019) at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=yQWbZ3Pbg_PLUS_HW_PLUS_tJ3uVKLfg ==.

9.      In February 2019, New York enacted the Child Victims Act (the "CVA"), which made significant changes to the statute of limitations applicable to civil actions alleging claims of childhood sexual abuse.  Prior to the CVA, the statute of limitations ranged from one to five years from the time the victim turned 18 years of age, but, prospectively, the CVA permits childhood sexual abuse claims to be brought until the victim reaches 55 years of age.  In addition, the CVA opened a "revival window" during which time any victim of childhood abuse could assert previously time-barred civil claims.  The CVA's original revival window extended from August 14, 2019 until August 13, 2020, and, during the COVID-19 pandemic, the window was further extended for an additional year, through August 13, 2021.

10.      In the two (2)-year period that the revival window was open, Madison was named as a defendant in eighty-six (86) separate actions brought by a total of 149 claimants (the "CVA Claimants" and such claims, the "CVA Claims").[3]  The CVA Claims allege abuse by eleven (11) employees or volunteers at Madison that occurred between 1941 and 1988; none of these claims relate to any contemporary conduct.  Rockefeller was named as a co-defendant by eighty-eight (88) of the CVA Claimants, although Rockefeller—as described more fully herein—is believed by Madison to bear the overwhelming responsibility for all claims related to Dr. Archibald's misconduct (i.e., with respect to more than 90% of the pending CVA Claims against Madison). The national Boys & Girls Clubs of America ("BGCA") was named as a defendant by ninety-eight (98) of the CVA Claimants.

---

[3]    On May 24, 2022, Governor Kathy Hochul signed into law the Adult Survivors Act (the "ASA"), which enables survivors of sexual assault that occurred when such individuals were over the age of 18 to bring a suit for time-barred claims during a one (1)-year period beginning in November 2022.  While Madison is not aware of any claims that may be filed against Madison that would arise under the ASA, it will seek to resolve any such potential claims in the chapter 11 case.

11.     When the CVA Claims were first filed, Madison attempted to address them on an individual basis, but Madison soon realized that it would likely be unable to incur the mounting legal and administrative costs associated with managing that magnitude of litigation.  In 2020 and 2021, Madison engaged legal and financial advisors to develop a comprehensive solution aimed at fairly and equitably compensating the CVA Claimants, while enabling Madison to continue fulfilling its vital mission of serving young people who are most in need of its services.

12.     Madison's financial resources for addressing the CVA Claims were always extremely limited.  As of the Petition Date,  Madison has approximately $1.3 million in cash for restructuring and operating expenses and, as demonstrated on **Annex A** hereto, is projected to deplete its available cash by September 2022.  In addition, only one insurer has agreed to provide coverage with respect to certain of the CVA Claims (subject to a reservation of rights and other limitations, some of which Madison disputes).  Thus, from the outset, Madison and its advisors were focused on two (2) overarching objectives: (a) implementing a restructuring strategy to avoid a prolonged, costly chapter 11 case that would deplete the assets available to compensate CVA Claimants and (b) securing financing to enable Madison to administer this chapter 11 case, fund an equitable recovery for the CVA Claimants, and emerge with the ability to continue to operate in a manner consistent with its charitable mission.

13.     Guided by these objectives, Madison and its advisors engaged in extensive prepetition discussions with key stakeholders to garner consensus, and financial support, for a prearranged restructuring.  Outreach efforts extended to (a) counsel to over 80% of CVA Claimants (the "Ad Hoc Committee"), (b) Rockefeller, (c) insurers with respect to whom Madison uncovered evidence of primary or secondary coverage, and (d) BGCA.

14. Over the course of the last year, Madison and its advisors worked diligently to advance discussions regarding a prearranged restructuring with Madison's key stakeholders, including conducting multiple diligence sessions, populating a data room with thousands of documents, and circulating term sheets and economic proposals, as applicable, to the various parties. Madison also engaged in extensive efforts to identify potential financing sources to fund a potential chapter 11 process. Despite the increasing urgency of Madison's situation, Madison did not receive the requisite level of engagement with, or actionable responses from, the necessary parties regarding the terms of a prearranged case.

15. It became clear in the beginning of the second quarter of 2022 that Madison's unrestricted resources were not sufficient to sustain the prolonged pace of negotiations and anticipated litigation expenses for much longer. Liquidation loomed as a real and potentially unavoidable outcome, one that weighed heavily on Madison and its Board as they looked forward to the start of summer programs in which thousands of children had already enrolled. However, a traditional chapter 11 filing without any stakeholder support was not a viable option because Madison lacks the resources to fund such a process, let alone provide recoveries of any kind to the CVA Claimants.

16. To avoid a fate where Madison is forced to shut its doors, the Board authorized Madison's advisors to continue third-party discussions for as long as Madison's liquidity would permit, while preparing for a chapter 11 filing that would seek court-ordered mediation at the outset of the case for a limited time, and, pursuant to sections 105 and 305 of the Bankruptcy Code and this Court's inherent powers to control its docket, seek suspension of other proceedings during the pendency of the mediation to reduce the administrative expense burden on the Debtor's estate.

17.     As described further herein, and in the Mediation Motion and Suspension Motion (each as defined herein) filed contemporaneously herewith, court-ordered mediation and suspension is the only conceivable path to compel necessary parties to engage in constructive negotiations and conserve Madison's limited unrestricted resources to provide Madison with an opportunity to reach a comprehensive restructuring solution.  While no outcome is certain, Madison believes that this strategy will give Madison the best chance to preserve and continue its 138-year legacy of community, stability, and education for New York City's youth in the most underserved communities.  Assuming Madison is able to reach a comprehensive restructuring solution with the support of its key stakeholders, Madison expects to have access to the necessary funding to pursue a plan confirmation process.[4]

18.     Madison filed this chapter 11 case to address decades-old claims.  At this critical juncture, Madison is also focusing on its future and recognizes that the need for its services is greater than ever.  A comprehensive restructuring solution will maximize Madison's ability to preserve the support of its donors. Further, since May 2022, Madison has been working with Deloitte Consulting LLP to evaluate Madison's role within the context of the New York City boroughs, neighborhoods, families, and children that Madison serves and to develop a strategic plan that will optimize support for Madison's members and communities going forward.

### Background

**I.      Overview of Madison and Its Charitable Mission**

**A.      Madison's Origins and 138-Year Legacy**

19.     Madison is a New York not-for-profit corporation that was founded in 1884 to provide recreational and vocational programs designed to keep young people off the streets and

---

[4]     Madison is in advanced discussions with a potential debtor-in-possession financing source, but does not have a commitment for such financing as of the Petition Date.

away from gang activity. Starting out in a vacant store on First Avenue and 37th Street and now operating six (6) clubhouse facilities across New York City (the "Clubhouses"), Madison has remained committed throughout its 138-year history to maintaining a safe and engaging environment that supports and empowers youth in New York City's most under-resourced communities.

20.    Madison began as a mission of the Madison Square Church before becoming an independent organization in 1902. Madison is a founding member of BGCA and the oldest Boys & Girls Club in New York City. Although originally established as Madison Square Boys' Club, co-ed activities were always a part of Madison's programs, and Madison's trustees were instrumental in founding the Girls Club of New York in recognition of the need for girls' programs. In 1984, Madison's Clubhouses were officially opened to all young people and the organization was renamed Madison Square Boys & Girls Club, Inc.

21.    Madison's core mission is to save and enhance the lives of New York City boys and girls who, by reason of economic or social factors, are most in need of its services. Central to Madison's work is the belief that while talent is distributed evenly, opportunity is not. Thus, since its inception, Madison has focused on bringing opportunity to youth in marginalized communities, helping them see beyond their circumstances, and giving them the tools and outlets they need to succeed in school, develop strength of character, and adopt healthy lifestyles.

22.    Pursuit of this mission for more than a century has created a rich legacy of impact that is reflected in the lives of thousands of current and former members. Madison alumni include doctors, lawyers, city officials, executives, athletes, filmmakers, businesspersons, and a federal judge. Many have given back to their communities. Madison continues to grow and expand this

impact by fostering an environment where all of its members can pursue their passions and prepare for future success.

23.      In May 2022, Madison held its annual Youth of the Year ceremony to honor five outstanding Madison members.  The honorees shared the indelible impact that Madison had on their often challenging upbringing and how Madison's Clubhouses shaped their future trajectories, including chosen career paths in law, medicine, business, and engineering.  Each described Madison as a home that provided them with safety, confidence, and the opportunity to grow and flourish.

### B.      Madison's Clubhouses

24.      In the early years, Madison operated in a variety of buildings, including public schools, private houses, and church basements.  Madison's trustees took turns opening the facilities and supervising the recreational and vocational programs, including crafts, dramatics, sports, lectures, and trade classes.  In 1939, Herbert Hoover, then Chairman of the National Association of Boys Clubs, opened Madison's first dedicated facility on 29th Street in Manhattan.  Today, Madison continues to carry out its mission in the following six (6) Clubhouses located in the Bronx, Manhattan, and Brooklyn:

- The Joel E. Smilow Clubhouse in the Crotona Park East neighborhood in the Bronx;

- The John E. Grimm III Clubhouse in the Belmont neighborhood in the Bronx;

- The Pinkerton Clubhouse in the Harlem neighborhood in Manhattan;

- The Thomas S. Murphy Clubhouse in the Flatbush neighborhood in Brooklyn;

- The Navy Yard Clubhouse in the Navy Yard neighborhood in Brooklyn; and

- The Elbaum Clubhouse in the Brownsville neighborhood in Brooklyn.



25.     Madison owns each of the Clubhouses except for the Pinkerton Clubhouse and the Elbaum Clubhouse.[5]   The Pinkerton Clubhouse is owned by Madison's affiliate support corporation, non-debtor entity MSBGC-NYC Support Corporation ("MSBGC-NYC").  Madison operates out of the Pinkerton Clubhouse pursuant to a lease with MSBGC-NYC, which is described more fully below.  The Elbaum Clubhouse operates in the Frederick Douglass Academy VII High School/Teachers Preparatory High School.

26.     The Clubhouse locations were selected to maximize Madison's impact on under-resourced neighborhoods, and each provides important services to its local community.   The majority of Madison's members come from families with average earnings of between $21,000 and $30,000 a year.  For many Madison members, their Clubhouse is a home away from home. Each Clubhouse is open to young people ages six (6) to eighteen (18) and offers daily after-school programming from 3:00 p.m. until 8:30 p.m.  While Madison operated at a reduced capacity during

---

[5]    While Madison owns four of the six Clubhouses, its ownership interest in the four owned Clubhouses is subject to use restrictions incorporated in the relevant deeds for some of these properties or restrictions otherwise imposed on the properties by the various grants Madison receives from governmental units.

the 2020-2021 academic year and communities continue to be impacted by the COVID-19 pandemic, Madison's overall Clubhouse registration goal is over 3,500 members for the remainder of the year, up 27% from the last academic year. In addition, 568 boys and girls will be participating in this summer's Club Fun program.

27.     At the Clubhouses, members participate in a variety of enrichment, social, and recreational activities.  Each of Madison's targeted programs is rooted in the "Formula for Impact" approach, a research-based theory for effective youth development and empowerment through fulfillment of five key elements:

(i)      A safe, stable, positive place that ensures physical and emotional safety;

(ii)     Fun activities that foster connections to peers and staff;

(iii)    Supportive relationships that reinforce that all members are cared for;

(iv)    Abundant opportunities to explore interests and build new skills; and

(v)     Recognition and positive reinforcement for accomplishments.

28.     Madison implements the Formula for Impact by gearing its programs toward promoting three priority outcomes:  (a) Academic Success, (b) Good Character & Citizenship, and (c) Healthy Lifestyles.  The Academic Success programs are designed to provide Madison's members with the support they need to succeed throughout their academic lives and to graduate from high school ready to pursue college or a career.  These programs encourage engagement in learning from an early age; complement members' regular school-day activities; enhance academic performance; foster positive study habits and self-discipline; and provide guidance and resources to keep members on track as they transition through school and beyond.  Madison offers resources including homework help and academic enrichment programs, mentorship, and computer and technology resources.

29.     The Good Character & Citizenship programs are designed to help members develop leadership capabilities and make a difference in their communities.  These programs promote the development of a positive self-image and strong character; teach positive, effective strategies for responding to conflict; encourage the development of meaningful relationships with others; empower youth to support and influence their Clubhouse and community; and teach respect for all cultures.  Activities include organizing clothing and food drives, volunteering at public events, and leading projects in members' neighborhoods.  These service projects encourage members to become caring, responsible members of their communities while cultivating their leadership skills.

30.     The Healthy Lifestyles programs are designed to encourage Madison's members to adopt a healthy diet, practice positive lifestyle choices, and make a lifelong commitment to fitness. The programs promote the importance of leading a healthy and productive lifestyle; encourage positive decision-making for physical, social, and emotional development; teach good sportsmanship, and social and interpersonal skills; and educate members and their families on the importance of a healthy lifestyle.

31.     Madison also provides members with access to a variety of activities designed to explore their creativity, provide exposure to new cultural experiences, and build social and interpersonal skills.  These activities include dance, digital arts, visual arts, drama, fashion, table and board games, movie nights, and other recreational pursuits.  Each of the Clubhouses (except for the Elbaum Clubhouse) is outfitted with state-of-the-art music studios, where members can engage in all facets of music production from writing music and playing instruments to recording songs and doing sound engineering.

32.     While Madison was forced to close its physical Clubhouses in March 2020—for the first time in its history—due to the COVID-19 pandemic, it quickly pivoted direction to

continue to provide its core services, including (a) launching a virtual after-school program, (b) instituting a weekly food pantry, which has delivered more than 262,000 pounds of food (the food pantry continues to operate today based on available funding), and (c) implementing a weekly outreach to parents and bi-monthly virtual parent nights to give parents the opportunity to receive updates and information and connect with others.

33.    In the summer of 2020, Madison reopened the Clubhouses and ran a modified version of its typical camp experience for children between six (6) and twelve (12) years old, while implementing rigorous health precautions.  In addition, when Madison learned that the citywide, city-funded summer youth employment program was initially going to be cancelled, it developed its own teen employment programs that provided teens the opportunity to build career skills, contribute to their communities, and earn spending money.  Madison's adaptation to these unprecedented challenges revealed its unwavering commitment to support its members and their families, as well as the deep well of support for Madison and its mission among a network of friends, advocates, and donors.

### C.    Child Safety

34.    Madison's top priority is ensuring the safety and well-being of its members.  In 2019, Madison formally established a dedicated child safety committee, composed of Board members, leadership team members, staff and insurance brokers, to provide input and guidance on local policies and safety strategies.  Priorities and initiatives of the safety committee include a zero incident culture and emergency preparedness.  Each year, Madison reviews its performance through an annual safety assessment.

35.    All of Madison's staff and volunteers receive mandatory criminal background checks and their names are run through the National Sex Offender Registry.  Madison's staff and volunteers are also mandated reporters who are obligated to immediately report any critical

incident or safety concern to local authorities.  The safety guidelines in place also prohibit private one-on-one contact with members, require 100% participation in abuse prevention training for all staff and volunteers, implement safety spot-checks, and include additional policies governing supervision, transportation, and communication.

36.      Madison has also partnered with Praesidium, a national safety expert, to establish a 24-hour toll-free child safety hotline for staff, members, and families. Other partnerships for safety include several through BGCA (the National Child Safety Advisory Task Force, the Blue Ribbon Taskforce, Mental Health First Aid, and the Crisis Text Line), as well as local partnerships with New York government agencies (NYPD Community Affairs, the NYS Department of Mental Health & Hygiene Safety Assessment Unit, the NYS Office of Children & Family Services, and the NYS Office of Alcoholism & Substance Abuse Services).[6]

## II.    Madison's Capital Structure

### A.      Secured and Unsecured Debt

37.      As of the Petition Date, Madison has no secured or unsecured funded debt and Madison believes it owes a *de minimis* amount, if any, on account of trade claims.

### B.      New Markets Tax Credit Program

38.      In 2017, Madison utilized the New Markets Tax Credit Program (the "NMTC Program") to finance the construction of the Pinkerton Clubhouse, which is owned by Madison's non-debtor affiliate, MSBGC-NYC.  The NMTC Program is a federal program administered by the U.S. Department of the Treasury's Community Development Financial Institutions Fund,

---

[6]      More information on Madison's child safety focus and policies is available on Madison's website at Child Safety—Madison Square Boys & Girls Club: https://www.madisonsquare.org/child-safety.

which incentivizes private-sector investment in community development and economic growth projects in underserved areas by providing tax credits to investors in such projects.

39.     To obtain the benefits of the NMTC Program, Madison invested $25.5 million (the "NMTC Leveraged Loan") in the form of a secured loan to Harlem Clubhouse Investment Fund, LLC ("HCIF"), a special purpose entity, and PNC Bank ("PNC") provided HCIF an equity capital investment in the amount of approximately $12.9 million.   In turn, HCIF loaned approximately $38 million in the aggregate to MSBGC-NYC through a number of Community Development Entities ("CDEs") to fund the construction and operation of the Pinkerton Clubhouse (the "NMTC Transaction," the loans provided thereunder to MSBGC-NYC, the "NMTC Loans," and the documents governing the NMTC Transaction, the "NMTC Documents").

40.     Madison leases the Pinkerton Clubhouse from MSBGC-NYC in exchange for quarterly lease payments to MSBGC-NYC (the "Lease Payments").   Upon receipt of the Lease Payments, MSBGC-NYC remits payment on account of the NMTC Loans to the CDEs, which remit such funds to HCIF to enable HCIF to satisfy its debt service obligations to Madison under the NMTC Leveraged Loan.   A diagram of the NMTC Transaction structure is below for illustrative purposes:



41.     Madison also guarantees certain of MSBGC-NYC's obligations under the NMTC

Loans. The NMTC Documents dictate that if there is a default under the NMTC Loans, including

as a result of a chapter 11 filing by Madison, and the NMTC Transaction structure fails and a

recapture event occurs, then PNC has a claim against both MSBGC-NYC and Madison (the "PNC

Secured Claim") to compensate for PNC's loss of $14.8 million of federal tax credits, plus fees

and related costs. The PNC Secured Claim is secured by the Pinkerton Clubhouse and Madison's

interest in MSBGC-NYC. Additionally, under the NMTC Documents, Madison has agreed to

forbear from pursuing any recovery on account of the NMTC Leveraged Loan until PNC is paid

in full.

### C.     Source of Funding

42.     Madison funds its operations through private donations, investments, and

government grants.

(a)     *Donor Contributions*

43.     Madison relies heavily on fundraising to finance its operations, which comes in the

form of both restricted and unrestricted donations. The use of restricted assets is strictly subject

to the donor's intent. Accordingly, Madison may use such funds only in accordance with any

purpose or use specified by the donor.

44.      To assist Madison's fundraising efforts, Madison Square Boys & Girls Club

Foundation, Inc. (the "Foundation"), a New York not-for-profit corporation, was established in

2020 in compliance with sections 501(c)(3) and 509(a)(3) of the Internal Revenue Code to support

Madison's mission through fundraising activities. The Foundation is an independent entity,

however, the bylaws of the Foundation require a majority of the trustees on its board also serve on

Madison's Board. The Foundation began operations on August 1, 2021. On an annual basis, the

Foundation's board approves a proposed grant schedule to fund Madison's operational needs. The

16

grants are then distributed to Madison to the extent the funds are raised and available for such

designated purposes.  In the first three quarters of fiscal year 2022, the Foundation distributed

$1.23 million in grants to Madison.[7]

(b)   *Investments*

45.   Madison's operations are also funded by withdrawals from its restricted and

unrestricted investment assets.  Madison's restricted investment assets fall into four broad

categories:  (i) endowment funds, (ii) interest in perpetual trusts, (iii) scholarship funds, and

(iv) the proceeds of Madison's 100th anniversary campaign that began in 1982.  As of the Petition

Date, Madison has approximately $48 million of restricted investments.

46.   Historically, Madison's budget was also funded by an annual withdrawal from a

Board-designated endowment, pursuant to which the Board determined to treat funds as an

endowment even though the donors of those funds did not impose any restriction on spending.

However, these unrestricted investments have been converted into cash prior to the Petition Date

to fund Madison's restructuring process.

(c)   *Government Grants and Contracts*

47.   Approximately 12-20%[8] of Madison's annual operating budget is funded through

a variety of government grants and contracts which are used in accordance with each respective

grant and the restrictions imposed thereunder, as applicable.  Madison has received, or expects to

receive, grants from the New York State Office of Alcoholism and Substance Abuse Services,

New York State Child and Adult Care Food Program, New York City Department of Youth and

---

[7]   In addition, the Foundation pays Madison on at least a quarterly basis for certain services, including the provision of certain professional and administrative staffing, office space, office equipment, office furniture, office supplies, office services, and other administrative support, pursuant to a shared services agreement that sets forth agreed rates, which are to be reviewed and renegotiated after the initial term through September 2023.

[8]   In fiscal year 2021, a one-time government contract to provide remote learning support during the COVID-19 pandemic resulted in government funding representing approximately 30% of the operating budget.

Community Development, New York State Office of Children and Family Services, and Office of Juvenile Delinquency Program.  For use in connection with construction and upkeep of its Clubhouses, Madison has received capital grants from the Dormitory Authority State of New York (the "DASNY") and the New York City Economic Development Corporation (the "EDC").  In exchange for the grant money, DASNY and EDC require Madison to accept various forms of restrictive covenants that ensure the funding will be used for its intended public interest purpose for several years after the grant.

48.     In fiscal year 2021, Madison received approximately $2.9 million in government funding and expects to receive approximately $2.1 million in fiscal year 2022.

**III.    Madison's Insurance Policies**

49.     Madison's insurance portfolio consists of historical comprehensive general liability ("CGL") policies that were in place at the time the alleged abuse occurred, as well as current Employment Practices Liability ("EPL") policies that were in place at the time the CVA Claims were filed against Madison.  As described below, Madison has expended significant resources trying to uncover available insurance coverage but its efforts have been met with limited success to date.  One challenge to this endeavor is that the CVA Claims concern events that are four to eight decades old.

50.     In December 2018, Madison retained an insurance archeologist (the Insurance Archeology Group, or "IAG") to perform a review of available information and make inquiries from insurers and brokers to augment Madison's understanding of potentially available CGL insurance policies.  Madison's insurance coverage counsel, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), worked with IAG, whose extensive efforts included reviewing hard-copy records located in Madison's storage facility, searching historical litigation records from public files, making inquiries to New York's Workers' Compensation Board, interviewing current and former

18

employees of Madison, and conducting inquiries and follow-up correspondence with various insurance carriers and brokers.  As of the Petition Date, IAG has uncovered evidence of twenty-four (24) primary policies for the years 1970 to 1991 and eleven (11) excess policies for the years 1983 to 1995.

51.    Pillsbury gave notice of the CVA Claims to each of Madison's identified historical general liability insurers, but all have denied coverage with the exception of the Federal Insurance Company ("Federal"), who has agreed to participate in the defense of Madison (subject to a reservation of rights) for claims where the sexual abuse was alleged to have occurred during the policy periods under two insurance policies (the "Federal Policies") for the periods between 1977 and 1979, which covers twenty (20) of the seventy-six (76) complaints that remain unresolved.  To date, Federal has reimbursed only a portion of the total legal fees incurred by Madison's special litigation counsel using discounted rates.  Madison disagrees with Federal regarding the coverage limits under the Federal Policies and Federal's inadequate fee reimbursement practices.  In addition, Madison has located secondary evidence of a policy with Federal for the period between 1976 and 1977, including references to such policy in one of the Federal Policies, as well as a letter addressed to Federal in 1970 reflecting the existence of a policy at that time, which Federal has not acknowledged.

52.    Madison has repeatedly informed Federal of its position with respect to the scope of coverage under the Federal Policies, the existence of additional coverage, and Federal's obligations under the New York State Department of Financial Services Insurance Circular Letter No. 11, dated September 12, 2019, which requires insurers in the case of CVA-related insurance claims to, *inter alia*, "exert diligence to seek out copies of relevant policies of current and prior

policyholders" and "encourages Insurers to do more than the minimum required."[9]   However, those disputes remain unresolved as of the Petition Date.  Madison also believes that there may have been coverage in other years from other insurers and worked with IAG to locate evidence of this additional coverage, but, as of the Petition Date, these further efforts have not been successful.

53.    Separate from the historical CGL policies, Madison also pursued prepetition litigation seeking coverage through a recently issued EPL policy with Atlantic Specialty Insurance ("ASI"), its primary insurer, which has a $5 million aggregate limit, and is the first layer in a $20 million tower.  Following ASI's denial of coverage, Madison brought a declaratory judgment action in New York Supreme Court and filed a summary judgment motion seeking a ruling that coverage was available under the policy for the CVA Claims.  On December 28, 2020, the court denied Madison's motion and, one week later, granted ASI's summary judgment motion holding that the CVA Claims were not covered by the policy and, even if they were, fell within an exclusion in the policy concerning sexual abuse.  Madison's excess insurers, Great American Insurance Company and Philadelphia Indemnity Insurance Company, asserted that ASI's arguments apply to their EPL policies as well and the court granted their motions for summary judgment on September 21, 2021.  Madison appealed the summary judgment decisions, but on April 21, 2022 the Appellate Division, First Department affirmed the Supreme Court's rulings.

---

[9]    The New York State Department of Financial Services Insurance Circular Letter No. 11 is available at https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_11.

IV.    **Circumstances Leading Up to This Chapter 11 Case**

A.    **The CVA Claims and Rockefeller University**

54.    On January 28, 2019, the New York State Legislature passed the CVA, which was signed into law on February 14, 2019.  The legislation modified the statute of limitations for victims of child sex abuse and, among other things, created a one (1)-year window during which alleged victims of sex abuse with time-barred claims could timely commence a civil action.  After a year-long extension due to the COVID-19 pandemic, the CVA window closed on August 13, 2021 and ultimately resulted in Madison being named as a defendant in eighty-six (86) lawsuits involving 149 plaintiffs.

55.    The CVA Claims arise from the conduct of eleven (11) individuals who worked or volunteered at Madison at different times during the 1940s to the 1980s.  Over 90% of the CVA Claims filed against Madison arose from the conduct of Dr. Reginald Archibald, an endocrinologist specializing in growth issues who was employed by Rockefeller and volunteered as a physician for Madison's members at Madison's former clubhouse on East 29th Street (which closed in 1999).

56.    Madison's litigation counsel, Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan"), moved to dismiss, answered, or entered into an agreement to extend the time to respond to the complaints, as applicable.  There have been several rulings to date on Madison's motions to dismiss complaints in pending CVA actions:

(i)    On October 28, 2021, Justice Deborah Kaplan of the New York State Supreme Court issued the first ruling on any of Madison's motions to dismiss, granting that motion in its entirety, while sustaining a number of claims against Rockefeller that were alleged in the same action. *Alfred Falzon, et al.* v. *Rockefeller, et al.* (Index No. 950247/2019, NYSCEF Doc. No. 102).

(ii)    On April 6, 2022, Judge Vernon S. Broderick of the United States District Court for the Southern District of New York granted in part and denied in

part Madison's motion to dismiss the complaint in the sole federal action pending against Madison. *C.M.* v. *The Estate of Dr. Reginald Archibald, et al.* (1:20-cv-00751-VSB, Doc. No. 26) .

(iii)    On May 24, 2022, Justice Laurence Love of the New York State Supreme Court issued three decisions granting in part and denying in part Madison's motions to dismiss, and sustaining claims against Rockefeller. *Andrew Cawley* v. *Madison, et al.* (Index No. 950142/2020, NYSCEF Doc. No. 62); *Richard Vespi* v. *Madison, et al.* (Index No. 950141/2020, NYSCEF Doc. No. 59); *Joseph Salamone* v. *Madison, et al.* (Index No. 950220/2020, NYSCEF Doc. No. 58).

(iv)    On June 1, 2022, Justice Love issued a decision granting in part and denying in part Madison's motion to dismiss a complaint asserting CVA claims on behalf of 26 plaintiffs. *Terrence Browne, et al.* v. *Madison* (Index No. 950155/2019, NYSCEF Doc. No. 44).

(v)    On June 2, 2022, Justice Love issued a decision denying Madison's motion to dismiss, and sustaining claims against Rockefeller. *R.F. II v. Rockefeller, et al.* (Index No. 950205/2020, NYSCEF Doc. No. 57).

57.    Madison has reached prepetition settlements with nine (9) CVA Claimants without any assistance from its insurers.  Despite these successes, Madison cannot sustain a piecemeal approach to claims resolution.  The magnitude of the pending litigation and the highly specific circumstances of each settlement make replicating those results with respect to the remaining 140 CVA Claimants unrealistic.  At the time of filing this chapter 11 case, Madison has spent more than $3.9 million on litigation-related costs and settlements, and legal and professional costs would continue to mount.

**B.    Retention of Restructuring Professionals and Prepetition Engagement with Key Stakeholders**

58.    Faced with the prospect of mounting litigation and related expenses following the passage of the CVA, Madison hired Paul, Weiss, Rifkind, Wharton & Garrison LLP as restructuring counsel in September 2020, and Teneo Capital LLC as its financial advisor in January 2021, to assist with strategic and contingency planning.  From the outset, an essential component of Madison's restructuring efforts was the engagement with key stakeholders and parties-in-

interest with the goal of negotiating a comprehensive solution that fairly and equitably compensates the CVA Claimants, while enabling Madison to continue its mission for underserved youth in New York City.

(a)   *Ad Hoc Committee Engagement*

59.   Beginning in March 2021 and leading up to the Petition Date, Madison and its advisors engaged in extensive discussions with six (6) different law firms[10] comprising the Ad Hoc Committee and the Ad Hoc Committee's legal and financial advisors, Pachulski Stang Ziehl & Jones LLP ("PSZJ") and IslandDundon, a joint venture of Dundon Advisers LLC and Island Capital Group, LLC ("Dundon" and, together with PSZJ, the "Committee Advisors"). Following the execution of non-disclosure agreements, Madison met with the Ad Hoc Committee and the Committee Advisors numerous times and provided comprehensive presentations regarding Madison's insurance policies and efforts to identify available coverage; Madison's assets, including detailed analyses of applicable restrictions; and Madison's claims against Rockefeller, as well as its strategy with respect to the pursuit of such claims. Madison thereafter addressed numerous follow-up inquiries from the Ad Hoc Committee and also established a data room populated with approximately 2,400 documents that were responsive to such inquiries and supported the information provided to the Ad Hoc Committee.

60.   On October 25, 2021, Madison provided the Ad Hoc Committee with a proposed restructuring term sheet that outlined a framework for a prearranged chapter 11 case. The term sheet contemplated a plan of reorganization providing for, among other things, the establishment of a compensation trust that would assume all of Madison's liabilities in connection with the

---

[10]   As of the Petition Date, the CVA Claimants' Counsel include: (a) Grant & Eisenhofer P.A.; (b) Marsh Law PLLC; (c) Herman Law Firm, P.A.; (d) Pfau Cochran Vertetis Amala PLLC; (e) Raphaelson & Levine Law Firm, P.C.; and (f) Slater Slater Schulman LLP.

CVA Claims and be funded with cash and other contributions from Madison and potentially other parties for the benefit of the CVA Claimants. On March 7, 2022, Madison made an opening proposal to the Ad Hoc Committee regarding the terms of Madison's contributions to the compensation trust. To date, the Ad Hoc Committee has not made a specific counterproposal. Unfortunately, Madison's dwindling liquidity required Madison to pivot from its prearranged restructuring strategy and file this chapter 11 case.

(b)    *Rockefeller Engagement*

61.    Given Madison's view that Rockefeller is principally liable for the vast majority of the CVA Claims, Madison and its advisors sought to engage with Rockefeller as part of its restructuring strategy. As detailed in the Debevoise Report, Rockefeller learned no later than 1960 of Dr. Archibald's misconduct when the New York County District Attorney's Office issued a grand jury subpoena for medical records for two of Dr. Archibald's patients.

62.    At the time the alleged abuse occurred, Rockefeller knew that Dr. Archibald volunteered at Madison and that he recruited children at Madison for his research on growth and development that was largely conducted at Rockefeller, and therefore benefited the institution's finances and reputation. Rockefeller was also aware that Madison permitted Dr. Archibald to recruit Madison members only because of his affiliation with Rockefeller and that Madison relied upon Rockefeller, as Dr. Archibald's employer, to notify Madison of any misconduct by Dr. Archibald about which Rockefeller was aware that could implicate Madison or harm the children it served. Despite its duty to Madison and its duty to prevent Dr. Archibald's misconduct and warn Madison of the existence thereof, Rockefeller failed to notify Madison of any wrongdoing and continued to approve and encourage Dr. Archibald's activities at Madison. As a result, Madison has significant claims against Rockefeller for negligence (breach of the duty to

warn), fraudulent concealment, negligent concealment and misrepresentation, public and private nuisance, and contribution and indemnification.

63.    Madison first initiated discussions with Rockefeller in September of 2020 regarding a potential contribution to a global solution with the CVA Claimants and to settle Madison's direct claims against Rockefeller. At that time, uncertainty surrounding the number of CVA Claims that would be filed against Madison related to Dr. Archibald's conduct before the deadline to file such claims passed impeded discussions. After the expiration of the filing deadline, Madison sought to re-engage with Rockefeller but the parties were unable to reach consensus.

(c)    *BGCA Engagement*

64.    BGCA is a separate legal organization from Madison, although the two entities have a long affiliation with one another. Madison is a founding member organization (sometimes referred to as a "local Club") of BGCA. Madison is reliant upon BGCA for, among other things, Madison's ability to use the intellectual property of the Boys and Girls Club brand. The National Council, which consists of each member organization, establishes national standards for each local Club, and BGCA board of governors has the authority to revoke the charter of any local Club not meeting the standards. Additionally, as described above, Madison relies upon various other services provided by BGCA, including those related to its youth protection programs, among other things.

65.    BGCA has been named as a defendant by ninety-eight (98) of the CVA Claimants. To date, BGCA, which is not a New York domiciled entity, has been pursuing its own defense of these claims. However, Madison and BGCA have communicated with one another and Madison believes that BGCA will be prepared to participate as a party in the mediation that Madison seeks to implement through the filing of this chapter 11 case.

(d)    *Potential Lender Engagement*

66.    Given the expense associated with attempting to address the litigation commenced by the CVA Claimants, Madison realized quickly that without additional sources of funding, it would not be able to engage constructively with the Ad Hoc Committee or afford the administrative and operational expenses of a chapter 11 process.  Thus, Madison and its advisors pursued parallel discussions with a number of parties that might have been willing to provide financial support in the form of a loan for Madison to implement a restructuring strategy.  In May 2022, Madison received a term sheet from a financial institution regarding a potential debtor-in-possession loan and the parties are engaged in advanced discussions concerning such loan.  If the negotiations are successful, Madison will seek approval of such financing from the Court.

## C.    Mediation and Suspension of Chapter 11 Proceedings

67.    Despite best efforts to achieve stakeholder support and funding for a prearranged chapter 11 case, Madison and its advisors realized the need to consider alternative strategies in the event that consensus was not reached while Madison's liquidity held out.  Whether Madison chose to continue litigating the CVA Claims out of court or file a chapter 11 case without stakeholder support, both options put the 138-year-old cornerstone of New York's underserved communities at risk of failure.  Any hope to maintain Madison as a going concern depends on a controlled, compulsory process that limits distractions and expenses.

68.    Accordingly, Madison filed the *Debtor's Motion for Entry of an Order: (I) Appointing the Honorable Shelley C. Chapman as Mediator; (II) Referring Certain Matters to Mandatory Mediation; and (II) Granting Related Relief* (the "Mediation Motion") and the *Debtor's Motion for an Entry of an Order (I) Temporarily Suspending its Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, and (II) Granting Related Relief* (the "Suspension Motion") contemporaneously herewith, pursuant to which Madison will seek the Court's approval

of (a) an order to compel mediation with the CVA Claimants for a period of ninety (90) days, and

(b) an order, under sections 105 and 305 of the Bankruptcy Code and the Court's inherent powers

to control its docket, to suspend other proceedings in the chapter 11 case while the mediation is

ongoing except with respect to certain proceedings, including:

(i)      making any payments or taking any actions authorized in connection with the First Day Motions;

(ii)     routine reporting and disclosure obligations, including filing of monthly operating reports and schedules and statements of financial affairs;

(iii)    paying chapter 11 quarterly fees to the U.S. Trustee under 28 U.S.C. § 1930(a)(6);

(iv)    the appointment of an official committee by the Office of the United States Trustee;

(v)     the scheduling and occurrence of the meeting of creditors pursuant to section 341 of the Bankruptcy Code;

(vi)    any proceeding related to the establishment of a bar date and filing proofs of claim in connection therewith;

(vii)   any proceeding related to (a) the retention of professionals under sections 327, 328, and 1104 of the Bankruptcy Code and (b) authorizing the Debtor to compensate professionals retained by the Debtor or any official committee pursuant to court order consistent with the Bankruptcy Code or any other order of the Court authorizing interim compensation;

(viii)  any proceeding seeking entry of an order authorizing the Debtor to incur postpetition financing pursuant to section 364 of the Bankruptcy Code;

(ix)    solely to the extent such party is a Mediation Party, seeking conferences with the Court regarding issues that may arise in connection with the Mediation Motion and any orders entered by the Court in connection therewith;

(x)     an official committee including CVA Claimants exercising their rights, if any, to propound formal bankruptcy court-ordered discovery in compliance with applicable law; provided that if the discovery is directed to the Debtor, an official committee including CVA Claimants shall first meet and confer with the Debtor before seeking such relief from the Court; provided, further that any party upon who discovery is propounded (or who is the subject of a motion for leave to serve discovery) may oppose or otherwise contest such discovery or motion;

(xi)    the Debtor, an official committee including CVA Claimants, the holders of CVA Claims, or any Mediation Party seeking clarification from the Court as to whether or not the filing of the Debtor's chapter 11 case can stay or otherwise affect actions against non-debtors; and

(xii)   an official committee of creditors communicating with its constituency pursuant to section 1102(b)(3) of the Bankruptcy Code or seeking the Court's authorization (by way of motion) to limit the disclosure of information to its constituency pursuant to section 1102(b)(3) of the Bankruptcy Code.

69.    As described in the Mediation Motion and the Suspension Motion, Madison believes that judicially imposed mediation, coupled with suspension, provides the best possible opportunity to reach consensus with the CVA Claimants and to minimize the risk that Madison would run out of resources to fund a process and continue its mission before a resolution could be reached.

70.    Absent committed financing or significant increased fundraising and donor support, Madison lacks the resources necessary to continue in chapter 11, even accounting for the proposed suspension, by September 2022.  Long-term financing and fundraising, however, are most likely successful only in the context of a global resolution.   Accordingly, if the proposed Court-ordered mediation does not result in a comprehensive restructuring solution, Madison likely faces the grim reality of being forced to consider shutting its doors and liquidating its assets—an outcome that would diminish value available to the CVA Claimants and result in an irreplaceable loss to New York City and the communities that Madison serves.[11]

---

[11]   The Debtor's 13-week liquidity forecast is attached hereto as **Annex A**.  As reflected in this liquidity forecast, the Debtor will run out of liquidity in approximately 60 days, subject to obtaining debtor in possession financing.  If the Debtor is unable to obtain the relief requested in the Mediation Motion and the Suspension Motion—*i.e.*, compelling parties to engage in the mediation to forge a comprehensive resolution, and limiting the administrative costs of the chapter 11 case on the Debtor's estate through the proposed suspension of proceedings—the Debtor likely lacks the ability to implement a restructuring transaction to the detriment of all parties in interest.

### D.    Forbearance Agreement

71.    As discussed above, pursuant to the NMTC Documents, Madison's commencement of this chapter 11 case constitutes a default under the NMTC Loans, and has the potential to cause PNC to forfeit all or a part of the associated federal tax credits.  To avoid this outcome, Madison proactively engaged with PNC and the CDEs to negotiate a forbearance arrangement that would enable the NMTC Transaction to remain unaffected by Madison's chapter 11 filing, avoid triggering a recapture event and the PNC Secured Claim, and provide the means through which PNC will get the benefit of its bargain in respect of the NMTC Transaction.

72.    These good faith, arm's-length negotiations culminated in the execution of a Forbearance Agreement, dated as of June 29, 2022, by and among Madison, PNC, each of the CDEs, HCIF, and MSBGC-NYC (Madison's non-debtor affiliate) (the "Forbearance Agreement").  The Forbearance Agreement provides, among other things, that PNC and the CDEs shall forbear from exercising remedies under the NMTC Documents as a result of this chapter 11 case for an agreed-upon forbearance period through September 30, 2022, subject to further extensions as set forth in the Forbearance Agreement.  The Forbearance Agreement also ensures that the NMTC Loans will continue to be serviced during the pendency of this chapter 11 case. Obtaining this forbearance with the CDEs is an essential element of Madison's overall restructuring strategy, because, among other things, it prevents the assertion of the PNC Secured Claim during the forbearance period, and preserves a valuable asset that is critical to Madison's restructuring and operations upon emergence from chapter 11.

### V.    Summary of First Day Motions

73.    To enable Madison to operate effectively and to minimize adverse effects of this chapter 11 case, Madison has filed, or will file upon scheduling of a further hearing by this Court, the motions and applications described below.  In connection with preparing for this chapter 11

case, I have reviewed each of the First Day Motions referenced below and described in detail on

**Annex B** hereto.

(i)     Debtor's Motion for Entry of an Order (I) Authorizing and Approving Special Noticing and Confidentiality Procedures, (II) Authorizing and Approving Procedures for Providing Notice of Commencement, and (III) Granting Related Relief

(ii)    Debtor's Application for Entry of an Order Authorizing Retention and Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent under 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 5075-1 and Granting Related Relief

(iii)   Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits, and (II) Granting Related Relief

(iv)    Debtor's Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief

(v)     Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, Modify, or Purchase Insurance Policies, and (C) Continue to Pay Brokerage Fees, and (II) Granting Related Relief

(vi)    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Maintain Investment Practices, and (II) Granting Related Relief

74.     The First Day Motions were prepared with my input and assistance, or the input

and assistance of Madison's employees working under my supervision. The information contained

in the First Day Motions is accurate and correct to the best of my information, knowledge, and

belief. I believe that the entry of orders granting the relief requested in these motions and

applications is critical to Madison's ability to preserve the value of its estate, succeed in its

reorganization efforts, and continue to provide its vital services to the communities it serves.

## VI.    **Information Required by Local Rule 1007-2**

75.    In accordance with Local Rule 1007-2, the schedules attached hereto provide

certain information related to the Debtor:

(i)      **Schedule 1** hereto provides a diagram of the Debtor's corporate structure.

(ii)     Pursuant to Local Rule 1007-2(a)(3), **Schedule 2** provides the names and addresses of the attorneys for the unofficial ad hoc committee of CVA Claimants organized prior to the order for relief in this chapter 11 case.

(iii)    Pursuant to Local Rule 1007-2(a)(4), **Schedule 3** hereto provides a list of the holders of the twenty (20) largest unsecured claims, excluding insiders.

(iv)    Pursuant to Local Rule 1007-2(a)(5), there are no holders of secured claims against the Debtor as of the Petition Date.

(v)     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the assets and liabilities of Madison.

(vi)    Pursuant to Local Rule 1007-2(a)(7), there are no shares of stock, debentures or other securities of Madison that are publicly held.

(vii)   Pursuant to Local Rule 1007-2(a)(8), **Schedule 5** hereto provides a list of Madison's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

(viii)  Pursuant to Local Rule 1007-2(a)(9), **Schedule 6** hereto provides a list of the premises owned, leased, or held under other arrangement from which Madison operates its business.

(ix)    Pursuant to Local Rule 1007-2(a)(10), **Schedule 7** hereto provides the location of Madison's substantial assets, the location of its books and records, and the nature, location and value of any assets held by Madison outside the territorial limits of the United States.

(x)     Pursuant to Local Rule 1007-2(a)(11), **Schedule 8** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against Madison or its property where a judgment against the Debtor or a seizure of its property may be imminent.

(xi)  Pursuant to Local Rule 1007-2(a)(12), **<u>Schedule 9</u>** hereto provides a list of the names of the individuals who comprise Madison's existing senior management, their tenure with Madison, and a brief summary of their relevant responsibilities and experience.

(xii)  Pursuant to Local Rules 1007-2(b)(1), 1007-2(b)(2)(A), and 1007-2(b)(2)(C), **<u>Schedule 10</u>** hereto provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, directors, and financial and business consultants retained by the Debtor for the 30-day period following the filing of the chapter 11 petition.

(xiii)  Pursuant to Local Rule 1007-2(b)(3), **<u>Schedule 11</u>** hereto provides, for the thirty (30)-day period following the filing of this chapter 11 petition, an estimate of the cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees.

[*Remainder of page intentionally left blank.*]

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 29, 2022
      New York, New York

                                                Madison Square Boys & Girls Club, Inc.
                                                Debtor and Debtor In Possession

                                                */s/ Jeffrey Dold*
                                                Jeffrey Dold

## SCHEDULE 1

*As of Petition Date*

```
┌─────────────────────────────┐          ┌─────────────────────────────┐
│ Madison Square Boys & Girls  │          │  Madison Square Boys & Girls │
│ Club, Inc. ("Madison")       │          │  Club Foundation, Inc.       │
│ Tax status: Not-for-Profit   │          │  Tax status: Not-for-Profit  │
└─────────────────────────────┘          └─────────────────────────────┘
           │
           │
      Sole Member
           │
┌─────────────────────────────┐          ■ Debtors
│ MSBGC-NYC Support Corporation│
│ ("Support Corp")             │
│ Tax status: Not-for-Profit   │
└─────────────────────────────┘
```

## SCHEDULE 2

Pursuant to Local Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in the chapter 11 case.

| Prepetition Committee | Counsel | Members |
|---|---|---|
| The Ad Hoc Committee of CVA Claimants | Pachulski Stang Ziehl & Jones LLP<br><br>10100 Santa Monica Blvd.<br>13th Floor<br>Los Angeles, CA 90067-4003 | 140 CVA Claimants represented by:<br><br>I.    Grant & Eisenhofer P.A. (9 CVA Claimants)<br>II.   Marsh Law PLLC (32 CVA Claimants)<br>III.  Herman Law Firm, P.A. (28 CVA Claimants)<br>IV.  Pfau Cochran Vertetis Amala PLLC (32 CVA Claimants)<br>V.   Raphaelson & Levine Law Firm, P.C. (37 CVA Claimants)<br>VI.  Slater Slater Schulman LLP (15 CVA Claimants) |

## **SCHEDULE 3**

Pursuant to Local Rule 1007-2(a)(4), provides a list of Madison's creditors holding the twenty (20) largest unsecured claims based on Madison's unaudited books and records as of the Petition Date. This list has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code. In order to protect the anonymity of abuse claimants, who comprise seventeen (17) of the twenty (20) largest unsecured claims against Madison, Madison has only identified the counsel representing these claimants in the following list. The information contained herein shall not constitute an admission of liability by, nor is it binding on, Madison. Madison reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Rank | Creditor | Address, Phone Number, Person Familiar with Account | Plaintiffs Represented | Estimated Amount of Claim | Contingent, Disputed, Unliquidated, Partially Secured |
|---|---|---|---|---|---|
| 1. | Raphaelson & Levine Law Firm, P.C. | Pennsylvania Building<br>14 Penn Plaza, Suite 1718<br>New York, New York 10122<br>(212) 268-3222<br>Steven Gershowitz .......... sgershowitz@rllawyers.com | 37 | TBD | C, U, D |
| 2. | The Marsh Law Firm, PLLC | 31 Hudson Yards, 11th Floor<br>New York, NY 10001-2170<br>(212) 372-3030<br>Jennifer Freeman.............jenniferfreeman@marsh.law<br>James Marsh ........................ jamesmarsh@marsh.law<br>Katie Shipp .............................katieshipp@marsh.law<br>Margaret Mabie............... margaretmabie@marsh.law<br>Brooke E. Berger | 32 | TBD | C, U, D |
| 3. | Pfau Cochran Vertetis Amala PLLC | 31 Hudson Yards, 11th Floor<br>New York, NY 10001-2170<br>Vincent T. Nappo....................vnappo@pcvalaw.com<br>Anelga Doumanian .......... adoumanian@pcvalaw.com | 32 | TBD | C, U, D |
| 4. | Herman Law Firm, PA | 434 W. 33rd St., Penthouse<br>New York, NY 10001<br>(212) 390-0100<br>Jeff Herman........................ jherman@hermanlaw.com<br>Daniel G. Ellis<br>Stuart S. Mermelstein<br>Jason S. Sandler | 28 | TBD | C, U, D |
| 5. | Slater Slater Schulman LLP | 488 Madison Avenue, 20th Floor New York, New York 10022<br>(212) 922-0906<br>Adam P. Slater .............................aslater@sssfirm.com<br>Linc C. Leder ............................. lleder@ sssfirm.com | 15 | TBD | C, U, D |
| 6. | Levy Konigsberg LLP | 605 Third Ave., 33rd Floor<br>New York, NY 10158<br>(212) 605-6200<br>Email............................................ info@levy-law.com<br>Renner K. Walker .................... rwalker@levylaw.com<br>Corey M. Stern............................cstern@levylaw.com<br>Anna Kull....................................akull@levylaw.com | 13 | TBD | C, U, D |

| Rank | Creditor | Address, Phone Number, Person Familiar with Account | Plaintiffs Represented | Estimated Amount of Claim | Contingent, Disputed, Unliquidated, Partially Secured |
|------|----------|-----------------------------------------------------|------------------------|---------------------------|-------------------------------------------------------|
| | | Matthew J. Shock | | | |
| 7. | Grant & Eisenhofer P.A. | 485 Lexington Avenue, 29th Floor New York, NY 10017 (646) 722-8526 Barbara J. Hart ................................ bhart@gelaw.com Irene Lax ........................................... ilax@gelaw.com Samantha Breitner..................... sbreitner@gelaw.com | 9 | TBD | C, U, D |
| 8. | Bleakley Platt & Schmidt, LLP | One North Lexington Avenue White Plains, NY 10601 (914) 949-2700 William P. Harrington...... wpharrington@bpslaw.com Adam Rodriguez ..................arodriguez@bpslaw.com | 8 | TBD | C, U, D |
| 9. | Weitz & Luxenberg | 700 Broadway New York, New York 10003 (856) 406-3999 Email.............................................info@weitzlux.com Jerry Kristal ............................ jkristal@weitzlux.com | 3 | TBD | C, U, D |
| 10. | Merson Law, PLLC | 950 Third Avenue, 18th Floor New York, New York 10022 (212) 603-9100 Jordan K. Merson................jmerson@mersonlaw.com Giovanna Mabile................gmabile@mersonlaw.com | 1 | TBD | C, U, D |
| 11. | Silver & Kelmachter, LLP | 11 Park Place Suite 1503 New York, NY 10007 Sameer Nath.................... snath@silverkelmachter.com | 1 | TBD | C, U, D |
| 12. | Marcowitz Law Firm | 225 Broadway 38th Floor Edward L.C. Marcowitz..........ed@marcowitzlaw.com | 1 | TBD | C, U, D |
| 13. | Seeger Weiss LLP | 100 Church Street 8th Floor, Suite 835 (212) 584-0700 Stephen A. Weiss................ sweiss@seegerweiss.com Michael Rosenberg ..... mrosenberg@seegerweiss.com Philippa Ratzki | 1 | TBD | C, U, D |
| 14. | Williams Ceder LLC | 1515 Market Street, Suite 1300 Philadelphia, Pennsylvania 19102-1931 (215) 557-0099 Gerald J. Williams ...... gwilliams@williamscedar.com Beth G. Cole ......................bcole@williamscedar.com Shauna L. Friedman ....sfriedman@williamscedar.com | 1 | TBD | C, U, D |
| 15. | The Simpson Tuegel Firm | 3301 Elm Street Dallas, TX 75226 (214) 774-9121 Michelle Simpson Tuegel ..........michelle@stfirm.com | 1 | TBD | C, U, D |
| 16. | Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz | 800 Commerce Street Houston, Texas 77002-1776 (713) 222-7211 Muhammad S. Aziz ......... info@abrahamwatkins.com | 1 | TBD | C, U, D |
| 17. | Harnick and Harnick, P.C. | 305 Broadway, Suite 602 New York, NY 10007 (212) 962-5065 | 1 | TBD | C, U, D |

| Rank | Creditor | Address, Phone Number, Person Familiar with Account | Plaintiffs Represented | Estimated Amount of Claim | Contingent, Disputed, Unliquidated, Partially Secured |
|---|---|---|---|---|---|
| | | Robert Harnick…………..rharnick@harnicklaw.com<br>Thomas Harnick …………tharnick@harnicklaw.com | | | |
| 18. | Gem Mechanical, LLC | 200 Franklin St Suite 3 Box 2<br>Brooklyn, NY 11222<br>(718) 383-1928<br>Email…………………….gemmechanical@gmail.com | 0 | 0[1] | |
| 19. | J&L Service NYC Inc. | 1949 66th Street<br>Brooklyn, NY 11204<br>917-939-0256<br>Kenny Yeung …………..........yeungkee@yahoo.com | 0 | 0[1] | |
| 20. | Alda Building Company | Alda Building Company<br>128 Norman Ave<br>Brooklyn, NY 11222<br>917-440-6909<br>Richard Musial ……………… aldabldgco@aol.com | 0 | 0[1] | |

1.    Certain creditors identified herein are listed with "$0" claim amounts. With respect to such creditors, the Debtor believes that invoices for outstanding amounts that may be owed to such creditors may not yet have been received by the Debtor.  Such creditors are listed herein in alphabetical order by creditor name.

## SCHEDULE 4

Pursuant to Local Rule 1007-2(a)(6), provides a summary of Madison's assets and liabilities.  Madison has not included in these estimates the total potential liability arising from claims made under the Child Victims Act in the 140 cases that were pending as of the Petition Date.  Any potential liability arising from these claims is contingent, unliquidated, and disputed. Nor has Madison included in these estimates the value of its insurance assets that provide coverage for both defense and payment on such claims.

| Assets and Liabilities | Total |
|---|---|
| **Assets** | |
| **Total Assets** | |
| (Book Value as of 5/31/22)............................ | $97,265,739 |
| | |
| Liabilities | |
| Total Liabilities | |
| *(Book Value as of 5/31/22)* ............................ | $2,800,011 |

## **SCHEDULE 5**

Pursuant to Local Rule 1007-2(a)(8), Madison does not have any property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

## **SCHEDULE 6**

Pursuant to Local Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which Madison operates its business.

| Address | City | State | Zip |
|---|---|---|---|
| John E. Grimm III Clubhouse, 543 East 189th Street | Bronx | NY | 10458 |
| Thomas S. Murphy Clubhouse, 2245 Bedford Avenue | Brooklyn | NY | 11226 |
| Joel E. Smilow Clubhouse, 1665 Hoe Avenue | Bronx | NY | 10460 |
| Navy Yard Clubhouse, 240 Nassau Street | Brooklyn | NY | 11201 |
| Pinkerton Clubhouse, 250 Bradhurst Avenue | New York | NY | 10039 |
| Elbaum Family Clubhouse, 226 Bristol Street | Brooklyn | NY | 11212 |

## **SCHEDULE 7**

Pursuant to Local Rule 1007-2(a)(10), sets the location of Madison's substantial assets, the location of its books and records, and the nature, location and value of any assets held by Madison outside the territorial limits of the United States.

| Locations of Substantial Assets | | | |
|---|---|---|---|
| **Address** | **City** | **State** | **Zip** |
| John E. Grimm III Clubhouse, 543 East 189th Street............................ | Bronx | NY | 10458 |
| Thomas S. Murphy Clubhouse, 2245 Bedford Avenue........................ | Brooklyn | NY | 11226 |
| Joel E. Smilow Clubhouse, 1665 Hoe Avenue..................................... | Bronx | NY | 10460 |
| Navy Yard Clubhouse, 240 Nassau Street............................................ | Brooklyn | NY | 11201 |

**Location of Books and Records**

| Address | City | State | Zip |
|---|---|---|---|
| Pinkerton Clubhouse, 250 Bradhurst Avenue ........................................ | New York | NY | 10039 |

## **SCHEDULE 8**

Pursuant to Local Rule 1007-2(a)(11), to the best of Madison's knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against Madison or its property, as of the Petition Date, where a judgment against Madison or a seizure of its property may be imminent. As of the Petition Date, Madison is a defendant in 140 cases commenced under the Child Victims Act.  Madison does not believe that judgment is imminent in any of these cases.

## **SCHEDULE 9**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), sets forth a list of the names of the individuals who comprise Madison's existing senior management, their tenure with Madison, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities and Experience |
|---|---|
| Tim McChristian Executive Director ...................................... | Tim McChristian has served as Madison's Executive Director since 2017. Prior to joining the Madison family, Mr. McChristian served as the Executive Director of the African Leadership Foundation in the United States, which supports the African Leadership Academy based in Johannesburg, South Africa.  His primary responsibilities included fundraising, execution of graduate support programming, and organizational leadership.  Tim became involved with the African Leadership Academy while living and working in South Africa with IBM. |
| Jeffrey Dold Chief Financial Officer ....................................... | Mr. Dold joined Madison Square Boys & Girls Club as CFO in 2014. At Madison, he assumes a strategic role in the overall fiscal management of the organization and is responsible for all finance and accounting related activities including budget management, financial reporting, forecasting, and -- investment oversight, as well as information technology for the organization. |
| | He is a Certified Public Accountant with over 18 years in the not-for-profit sector.  He began his career working at a CPA firm that specialized in not-for-profit organizations.  After working four years in public accounting, Jeffrey took a leadership position as Controller at Block Institute, an organization that serves individuals with special needs.  He was later promoted to Director of Finance and assumed additional responsibilities, including facilities management and organization wide purchasing.  He received his Bachelor's of Science degree in Accounting from St. John's University and holds a Certificate in Business Excellence from Columbia Business School. |
| Steven A. Melton Chief Operating Officer ........................................ | Steven A. Melton has spent his entire professional career ensuring that children from urban communities have a safe and enriching environment within which they can learn and grow.  Starting off as a part-time group leader at the Columbus Clubhouse in 1973, Steve has since served many roles at Madison Square Boys & Girls Club. He joined the executive leadership team over 20 years ago and oversaw Madison's expansion into Brooklyn and Queens, orchestrating successful mergers with the Navy Yard and Flatbush Boys Clubs and the opening of the Carey Gardens and Far Rockaway Clubhouses.  Steve is a graduate of Queens College and holds a Master's Degree in Public Administration from Baruch College. He also received a certificate in not-for-profit management from Columbia University. |

## SCHEDULE 10

Pursuant to Local Rules 1007-2(b)(1), 1007-2(b)(2)(A), and 1007-2(b)(2)(C), provides the estimated amount of payroll to Madison's employees (not including officers, directors, and stockholders), and the estimated amounts to be paid to officers, directors, and financial and business consultants retained by Madison, for the 30-day period following the Petition Date.

| Payments | Est. Payment Amount over Next 30 Days |
|---|---|
| Payments to employees (not including officers, directors, and stockholders)............................................ | $  430,686.24 |
| Payments to officers, directors, and stockholders .......................................... | $  59,313.76 |
| Payments to financial and business consultants ............................................ | $  – |

## **SCHEDULE 11**

Pursuant to Local Rule 1007-2(b)(3), provides a schedule, for the thirty (30)-day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

| Payments | Payment Amount |
|---|---|
| Cash Receipts ..................................................... | $   1,768,376.19 |
| Cash Disbursements ......................................... | $   (1,237,939.53) |
| Net Cash Gain.................................................... | $   530,436.67 |
| Unpaid Obligations............................................ | $   (185,952.65) |
| Unpaid Receivables ........................................... | $   109,518.67 |

## <u>Annex A</u>

**13-Week Liquidity Forecast**

**Madison Square Boys and Girls Club Inc. – Operating Projections Summary Including Actuals**

| ($) | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Proj. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Date | 7/2/2022 | 7/9/2022 | 7/16/2022 | 7/23/2022 | 7/30/2022 | 8/6/2022 | 8/13/2022 | 8/20/2022 | 8/27/2022 | 9/3/2022 | 9/10/2022 | 9/17/2022 | 9/24/2022 | 7/2/2022 |
| End Date | 7/8/2022 | 7/15/2022 | 7/22/2022 | 7/29/2022 | 8/5/2022 | 8/12/2022 | 8/19/2022 | 8/26/2022 | 9/2/2022 | 9/9/2022 | 9/16/2022 | 9/23/2022 | 9/30/2022 | 9/30/2022 |
| **Operating Revenue & Support** | | | | | | | | | | | | | | |
| Foundation Grants and Shared Services | - $ | 700,000 | - | - | - | - | - | - $ | 300,000 | - | - | - $ | 83,625 | - $ | 1,083,625 |
| Foundations & Corporate Support | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Special Events | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Individual Giving | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 | 1,411 $ | 18,347 |
| Government Support | 52,083 | - | - | 1,009,519 | 52,083 | - | - | - | 118,750 | - | - | - | 151,667 $ | 1,384,102 |
| Other Revenue | 282 | 282 | 282 | 282 | 282 | 282 | 282 | 282 | 282 | 282 | 282 | 282 | 282 $ | 3,669 |
| Net Restricted Investment Withdrawal | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Revenue, incl. Foundation** | $ 53,777 $ | 701,694 $ | 1,694 $ | 1,011,212 $ | 53,777 $ | 1,694 $ | 1,694 $ | 301,694 $ | 120,444 $ | 1,694 $ | 1,694 $ | 85,319 $ | 153,360 $ | 2,489,743 |
| | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Employee Salaries | $ (230,000) | - $ | (260,000) | - $ | (270,000) | - $ | (270,000) | - $ | (270,000) | - $ | (200,000) | - $ | (220,000) $ | (1,720,000) |
| Employee Benefits | (20,000) | - | (85,000) | - | (20,000) | - | (85,000) | - | (100,000) | - | (85,000) | - | (100,000) $ | (495,000) |
| Supplies and Program Support Services | - | - | - | (59,292) | - | - | - | (71,138) | - | - | - | (37,805) | - $ | (108,943) |
| Occupancy Costs (incl. Telephone) | - | - | - | (59,292) | - | - | - | (59,292) | - | - | - | (59,292) | - $ | (177,875) |
| Insurance | - | - | (53,000) | (18,667) | - | - | - | (18,667) | - | - | - | (18,667) | - $ | (109,000) |
| Professional Fees | - | (100,000) | - | - | - | - | - | (55,958) | - | (100,000) | - | (28,458) | - $ | (284,417) |
| Maintenance Capex and Repairs | - | - | - | - | - | - | - | (58,856) | - | - | - | (58,856) | - $ | (117,712) |
| Scholarships | - | - | - | (3,669) | - | - | - | (3,669) | - | - | - | (3,669) | - $ | (11,008) |
| Equipment Rental | - | - | - | (2,917) | - | - | - | (2,917) | - | - | - | (2,917) | - $ | (8,750) |
| Interest Expense & Bank Fees | - | - | - | (200) | - | - | - | (200) | - | - | - | (200) | - $ | (600) |
| Bad Debt Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Expenses | - | - | - | (10,108) | - | - | - | (10,108) | - | - | - | (10,858) | - $ | (31,073) |
| **Operating Expenses** | $ (250,000) $ | (100,000) $ | (398,000) $ | (94,852) $ | (290,000) | - $ | (355,000) $ | (280,804) $ | (370,000) $ | (100,000) $ | (285,000) $ | (220,721) $ | (320,000) $ | (3,064,377) |
| | | | | | | | | | | | | | | |
| **Operating Surplus / (Deficit)** | $ (196,223) $ | 601,694 $ | (396,306) $ | 916,360 $ | (236,223) $ | 1,694 $ | (353,306) $ | 20,889 $ | (249,556) $ | (98,306) $ | (283,306) $ | (135,402) $ | (166,640) $ | (574,634) |
| | | | | | | | | | | | | | | |
| Capital Expenditures | - | (305,088) | - | - | - | - | (327,111) | (34,957) | - | - | (318,951) | (34,957) | - $ | (1,111,063) |
| | | | | | | | | | | | | | | |
| **Surplus / (Deficit) before Restructuring Exp.** | $ (196,223) $ | 296,606 $ | (396,306) $ | 916,360 $ | (236,223) $ | 1,694 $ | (680,418) $ | (14,067) $ | (249,556) $ | (98,306) $ | (602,257) $ | (170,359) $ | (166,640) $ | (1,685,697) |
| | | | | | | | | | | | | | | |
| Restructuring / CVA Expenses | (30,000) | - | (45,000) | - | - | (90,000) | - | - | - | (650,000) | - | - | (51,504) $ | (866,504) |
| Restructuring Interest Expense and Fees | - | - | - | - | - | - | - | - | - | (150,000) | - | - | - $ | (150,000) |
| **Total Surplus / (Deficit)** | $ (226,223) $ | 296,606 $ | (441,306) $ | 916,360 $ | (236,223) $ | (88,306) $ | (680,418) $ | (14,067) $ | (249,556) $ | (898,306) $ | (602,257) $ | (170,359) $ | (218,144) $ | (2,702,201) |
| | | | | | | | | | | | | | | |
| **Cash and DIP Balance** | | | | | | | | | | | | | | |
| Beginning Cash Balance + Unrestricted Investments | $ 1,326,189 $ | 1,099,966 $ | 1,306,572 $ | 865,266 $ | 1,781,626 $ | 1,545,403 $ | 1,457,096 $ | 776,679 $ | 762,612 $ | 513,055 $ | (385,251) $ | (987,509) $ | (1,157,868) $ | 1,326,189 |
| Surplus / (Deficit) after Restructuring Exp. | (226,223) | 296,606 | (441,306) | 916,360 | (236,223) | (88,306) | (680,418) | (14,067) | (249,556) | (898,306) | (602,257) | (170,359) | (218,144) $ | (2,702,201) |
| **Cash and Unrestricted Investments Before DIP** | $ 1,099,966 $ | 1,306,572 $ | 865,266 $ | 1,781,626 $ | 1,545,403 $ | 1,457,096 $ | 776,679 $ | 762,612 $ | 513,055 $ | (385,251) $ | (987,509) $ | (1,157,868) $ | (1,376,012) $ | (1,376,012) |

## Annex B

**First Day Motions**

I.      **Administrative Motions:**[1]

    A.      **Debtor's Motion for Entry of an Order (I) Authorizing and Approving Special Noticing and Confidentiality Procedures, (II) Authorizing and Approving Procedures for Providing Notice of Commencement, and (III) Granting Related Relief (the "Notice and Confidentiality Procedures Motion")**

    1.      Pursuant to the Notice and Confidentiality Procedures Motion, the Debtor is seeking entry of an order (a) authorizing and approving the Confidentiality Procedures, which are designed to protect plaintiffs and employees, as more fully described herein; (b) authorizing the Debtor to implement certain procedures for mailing the Notice of Commencement of this chapter 11 case and the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code; and (c) granting related relief.

    2.      I understand that, pursuant to Bankruptcy Rule 1007(d), a chapter 11 debtor must file with its voluntary petition a list setting forth the names, addresses, and claim amounts of the creditors, excluding insiders, that hold the twenty (20) largest unsecured claims in the debtor's case (the "Top 20 List").

    3.      To protect the confidentiality of the identities and personal contact information of certain holders of claims against the Debtor arising from allegations of sexual abuse, to the extent such information is not otherwise available in the public record, and current and former employees of the Debtor, the Debtor is requesting entry of an order authorizing the redaction of the Creditor Matrix, the schedules of assets and liabilities, and any pleadings or other documents, including affidavits of service, filed in this chapter 11 case containing such information in accordance with the Confidentiality Proceedings.

    4.      Pursuant to the Confidentiality Procedures, the Debtor shall file on the docket a copy of the Creditor Matrix, and any amended Creditor Matrices, redacting the names of and listing

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the respective motions.

the contact information for counsel of record, where known for each holder of an Abuse Claim. If

no counsel of record exists, the identities and all other personal contact information of holders of

Abuse Claims shall be redacted. Due to the nature of the allegations by holders of Abuse Claims,

which pertain to sexual abuse, the redaction of the identities and personal contact information not

otherwise available in the public record from all documents filed in this chapter 11 case will aid in

protecting such persons against the disclosure of a sensitive matter in publicly filed documents.

5.      The Debtor shall also redact the personal contact information for any current or

former employee of the Debtor and use the Debtor's address and other contact information in lieu

of the personal contact information for any current or former employee of the Debtor.

6.      Further, the Debtor requests authority to have Epiq send the Notice of

Commencement to holders of Abuse Claims for whom the Debtor obtained sufficient contact

information within the four years immediately preceding the Petition Date and who have: (a) filed

lawsuits against the Debtor on account of Abuse Claims; (b) entered into any settlement agreement

with the Debtor relating to an Abuse Claim; or (c) received any payment from the Debtor or any

of the Debtor's insurers relating to an Abuse Claim, including for treatment in connection with the

Abuse Claim; provided that if the Abuse Claimant has known counsel, the Claims and Noticing

Agent shall send the Notice of Commencement only to such counsel, which counsel shall

immediately forward the Notice of Commencement to the Abuse Claimant. In addition, the Debtor

seeks authority to have the Claims and Noticing Agent mail the Notice of Commencement to the

creditors identified on the Creditor Matrix.

7.      I believe that the approval of the Confidentiality Procedures and form and manner

of the noticing described in the Notice and Confidentiality Procedures Motion is essential to

protecting the privacy of abuse victims and minors, preserving their identities from public

disclosure, and ensuring all interested parties are properly noticed.  Such approval is appropriate given the sensitivity of disclosure related to the Abuse Claimants and the minor litigants. Additionally, I believe that the circumstances of this chapter 11 case warrant the redaction of personal contact information and addresses for current and retired employees and volunteers of the Debtor.  I submit that it is appropriate to authorize the Debtor to redact from any paper filed with the Court in this chapter 11 case the address and contact information of the Debtor's employees and volunteers because such information could be used to perpetrate identity theft.  The threat of identity theft is of particular importance in this chapter 11 case, which the Debtor expects to garner substantial media publicity.  Further, the Debtor is confident that its noticing protocol is most likely to reach those creditors and parties in interest who may not have received notice by mail. Accordingly, the Debtor respectfully requests that this Court approve the form and manner of service of the Notice of Commencement, including notice by publication, in the foregoing manner.

**B.**  **Debtor's Application for Entry of an Order Authorizing Retention and Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent under 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 5075-1 and Granting Related Relief  (the "<u>Claims Agent Retention Application</u>")**

8.  I understand that this Court is authorized to utilize agents and facilities other than the Clerk for the administration of this chapter 11 case.  I believe that if Epiq Corporate Restructuring, LLC  ("<u>Epiq</u>") is retained as the claims and noticing agent (the "<u>Claims and Noticing Agent</u>") in this chapter 11 case, the distribution of notices and the processing of claims will be expedited and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims.  Prior to the Petition Date, the Debtor received proposals from three separate potential claims and noticing agents and, after review of such proposals, has selected Epiq as the Claims and Noticing Agent.  I have reviewed the Claims and Noticing Agent's engagement letter, which details the services that the Claims and Noticing Agent

has agreed to provide and the compensation to be paid for those services, as well as other terms of engagement more fully described in the Claims Agent Retention Application. Moreover, Epiq employs leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases.

9.      Based on that review, I believe that the Debtor's estate, creditors, parties-in-interest, and the Court will benefit from the Claims and Noticing Agent's experience and cost-effective methods. The Debtor submits that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. The Debtor asserts, and I agree, that the appointment of the Claims and Noticing Agent is the most effective and efficient manner by which to provide noticing and claims processing services in the chapter 11 case, and that approval of the Claims Agent Retention Application is thus necessary and in the best interests of the Debtor and its estate.

## II.    Operational Motions

**A.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits, and (II) Granting Related Relief (the "Wages Motion")**

10.      Pursuant to the Wages Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to (a) authorizing the Debtor to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, each subject to the caps and limits set forth herein, and (b) granting related relief.

11.      As of the Petition Date, the Debtor employed approximately forty-four (44) full-time and 110 part-time employees (each, an "Employee" and, collectively, the "Employees"). Approximately 135 of the Employees are non-exempt employees and approximately nineteen (19) are exempt employees.

12.     The Employees perform a variety of critical functions for the Debtor, including administration of programs essential to the Debtor's charitable mission and a variety of services related to finance, corporate governance, and human resources. The Employees' skills, along with their knowledge and understanding of the Debtor's operations and infrastructure, are essential to the effective operation of the Debtor. Disruption of the Employees' continued services would jeopardize the Debtor's efforts to reorganize and continue its charitable mission.

13.     The Debtor pays the Employees' wages and salaries biweekly via direct deposit through the electronic transfer of funds to the Employees' bank accounts. Each paycheck includes earnings accrued through the end of the previous payroll period. The Debtor estimates that its historical average monthly Employee Compensation is approximately $417,598.00. As of the Petition Date, the Debtor estimates that it owes approximately $185,000.00 on account of accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses, time-off benefits, and other benefits described in the Wages Motion) (the "Unpaid Compensation"), approximately $185,000.00 of which will come due within the first twenty-one (21) days after the Petition Date.

14.     To minimize the personal hardship the Employees could suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain stability of the Debtor's workforce during this chapter 11 case, the Debtor seeks through the Wages Motion the authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and other taxes), reimbursable expenses, flexible spending account funding, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, and certain other

benefits that the Debtor has historically provided in the ordinary course, all as described more fully in the Wages Motion (collectively, the "Employee Compensation and Benefits Programs"), as well as all costs and fees incident to the Employee Compensation and Benefits Programs.

15.     Subject to the Court's approval, the Debtor intends to continue its applicable prepetition Employee Compensation and Benefits Programs in the ordinary course.  Out of an abundance of caution, the Debtor requests confirmation of its right to modify, change, and discontinue any of its Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course during this chapter 11 case in the Debtor's sole discretion and without the need for further Court approval, subject to applicable law.

16.     The Employees would suffer hardship without the relief requested in the Wages Motion and, in many instances, financial difficulties, since the monies associated with the Employee Compensation and Benefits Programs are needed to enable the Employees to meet their personal obligations.  In addition, without the requested relief, I believe the Debtor's stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.  As a result, I believe that approval of the Wages Motion is in the best interests of the Debtor's estate and that the relief requested in the Wages Motion should be granted by the Court.

**B.     Debtor's Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "Utilities Motion")**

17.     Pursuant to the Utilities Motion, the Debtor seeks entry of an order (a) prohibiting utility providers from altering, refusing, or disconnecting services, (b) determining adequate assurance of payment for future utility services, (c) establishing procedures for determining adequate assurance of payment for future utility services, and (d) granting related relief.

18.    In the operation and management of its properties, the Debtor obtains Utility Services from a number of Utility Providers.  On average, the Debtor pays approximately $45,400.00 each month for Utility Services, calculated as an historical average payment for a twelve (12)-month period, which is representative of the Debtor's ongoing obligations. Accordingly, the Debtor estimates that its cost for Utility Services during the next thirty (30) days (not including any deposits to be paid) will be approximately $45,400.00.  The Debtor also has approximately $31,750.00 currently held as security deposits with two Utility Providers.

19.    I believe that preserving the Utility Services on an uninterrupted basis is essential to the Debtor's operation of its Clubhouses and administrative offices.  Any such disruption, even for a brief period, would adversely affect the Debtor's ability to provide programs and other services in accordance with its mission and jeopardize the administration of this chapter 11 case. Accordingly, it is essential that the Utility Services continue uninterrupted during the duration of the chapter 11 case.

20.    I understand that section 366(c)(2) of the Bankruptcy Code requires Madison to provide the Utility Providers with adequate "assurance of payment" within thirty (30) days of the commencement of this chapter 11 case to prevent a utility from altering, refusing or discontinuing Madison's utility services.

21.    Madison proposes to satisfy the requirement to provide "adequate assurance" in two ways.

22.    *First*, Madison intends to pay any postpetition obligations to the Utility Providers in a timely fashion and in the ordinary course, as it has substantially done prior to the Petition Date.

23.    *Second*, Madison also proposes to deposit, as adequate assurance of payment, approximately $22,700.00, equal to one half of Madison's average monthly cost of utility services,

calculated based on Madison's average utility expense over a twelve (12)-month period, into a segregated account (the "<u>Adequate Assurance Deposit</u>").  Madison estimates that the proposed Adequate Assurance Deposit is sufficient under the circumstances, particularly in light of Madison's ability to pay for future utility services in accordance with its prepetition practices.

24.     No liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.  The Adequate Assurance Deposit and existing deposits, in conjunction with cash on hand, cash flow from ongoing operations, and any proposed use of debtor-in-possession financing, demonstrates the Debtor's ability to pay for future utility services in the ordinary course and constitutes sufficient adequate assurance to the Utility Providers.  Additionally, I understand that the Debtor's proposed Adequate Assurance Procedures allow Utility Providers to request adequate assurance for unpaid utility services and additional adequate assurance when they believe the proposed amount is not sufficient.

25.     In my opinion, uninterrupted Utility Services are essential for Madison to maintain its headquarters and six (6) Clubhouses throughout New York City.  Any interruption in Utility Services, even for a brief period of time, would severely disrupt Madison's non-profit operations and jeopardize Madison's reorganization efforts.  Accordingly, I believe that (i) it is critical that the Utility Services continue without interruption during this chapter 11 case and  (ii) the proposed Adequate Assurance Deposit into the Adequate Assurance Account is sufficient to provide the Utility Providers with adequate assurance, as required by the Bankruptcy Code.  Consequently, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and should thus be approved by the Court.

C.   **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (C) Continue to Pay Brokerage Fees, and (II) Granting Related Relief (the "<u>Insurance Motion</u>")**

26.   The Debtor seeks entry of interim and final orders (a) authorizing the Debtor to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business, and (iii) continue to pay Brokerage Fees (as defined below), and (b) granting related relief.

27.   In the ordinary course of business, the Debtor maintains an insurance program consisting of approximately eleven (11) Insurance Policies maintained and administered by multiple third-party Insurance Carriers.  The Insurance Policies provide coverage for, among other things, Madison's directors' and officers' liability, employment practices liability, fiduciary liability, property liability, student accident liability, commercial automobile liability, and umbrella liability.

28.   As of the Petition Date, the Debtor owes an estimated $23,700.00 in prepetition amounts on account.  The Debtor seeks the authority to honor any amounts owed prepetition on account of the Premiums and any fees for brokerage services, and to continue honoring any such amounts that become due and owing on account of its Insurance Policies, including the Premiums and any fees related to brokerage services, in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies.

29.   Uninterrupted coverage under the Insurance Policies is essential to the preservation of the Debtor's properties and assets, and in many instances, is required by the regulations, laws, and contracts that govern the Debtor's commercial activities, including requirements by the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

Accordingly, I believe that the relief requested in the Insurance Motion should be granted by the Court.

**D.    Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate Its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Maintain Investment Practices, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>")**

30.    Pursuant to the Cash Management Motion, the Debtor seeks entry of interim and final orders (a) authorizing the Debtor to (i) continue to operate its Cash Management System (as defined below), (ii) honor certain prepetition obligations related thereto, (iii) maintain its existing Business Forms, and (iv) continue to maintain its investment practices, and (b) granting related relief.

31.    In the ordinary course of business, the Debtor utilizes a Cash Management System to collect, manage, invest, and disburse funds in support of its charitable mission. The Debtor holds various accounts with a number of financial institutions (the "<u>Banks</u>") to facilitate the Cash Management System.  A list of the Debtor's Bank Accounts and Investment Accounts (as such terms are respectively defined in the Cash Management Motion) along with a diagram setting forth the flow of funds among the Bank Accounts and Investment Accounts and summarizing the Cash Management System, as it exists on the Petition Date, is attached to the Cash Management Motion. An overview of the accounts which comprise the Debtor's cash management system is provided below.

32.    The Debtor maintains seven (7) cash accounts, all of which are held at JPMorgan Chase Bank, N.A.  The Debtor maintains eleven (11) Investment Accounts, ten (10) of which are subject to donor-specific restrictions, such as endowments, and one (1) which is unrestricted.  The various restrictions which apply to the Restricted Investment Accounts, and the institutions at which those accounts are held, are laid out in further detail in the Cash Management Motion.  The

Debtor is also a beneficiary of two perpetual trust brokerage accounts, held at JPMorgan Chase Bank N.A. and CitiTrust, respectively.

33.    The Debtor implements certain protocols to ensure that donor funds are used in accordance with any applicable restrictions.  In the ordinary course of business, the Debtor's resource development team flags each donation to the Debtor's finance personnel with a description of the donation and its restricted status.  This information is recorded and tracked in a donor data base.  Restricted funds that are expected to be used in the short term (typically less than a year) are placed in the General Operating Account (as defined in the Cash Management Motion) and disbursed from the General Operating Account or a disbursement account for their intended purposes.  Those that are not expected to be used in the short-term or are raised as part of a special campaign are typically segregated in a separate Bank Account or Investment Account.  At the end of each fiscal year, and in compliance with applicable New York law, the Debtor performs an accounting and reconciliation of the funds deposited in the General Operating Account to ensure that the Debtor's spending was consistent with applicable donor restrictions.

34.    The Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtor's business.  Because of the nature of the business and the disruption to the operations that would result if the Debtor were forced to close its existing bank accounts, it is critical that the Cash Management System remain in place.

35.    Moreover, the Debtor seeks a waiver of the section 345 investment guidelines and, to the extent necessary, the U.S. Trustee Guidelines.  Pursuant to this waiver, the Debtor requests authority to continue maintaining its Investment Accounts, in part because the Debtor has already liquidated all of its investment accounts with unrestricted assets other than the Operating Brokerage Account.  All the assets in the remaining Investment Accounts represent restricted

donations that must be used in accordance with their donative intent.  Moreover, the funds in the Investment Funds are invested conservatively.  Requiring the Debtor to limit its investments to U.S. government securities would be administratively difficult, potentially expensive, and of limited utility in achieving section 345(b)'s purpose of protecting funds for the benefit of the Debtor's creditors.

36.     As part of its Cash Management System, the Debtor uses various preprinted business forms (the "<u>Business Forms</u>") in the ordinary course.  To minimize estate expenses and avoid confusion during this chapter 11 case, the Debtor requests that the Bankruptcy Court authorize the Debtor's continued use of all existing preprinted correspondence and business forms, (including, without limitation, letterhead, checks, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtor's status as a debtor in possession, rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms.  The Debtor submits that once it has exhausted its existing stock of Business Forms, it will ensure that any new Business Forms reflect its status as a debtor in possession and, to the extent reasonably practicable, the Debtor will cause any checks electronically generated during this chapter 11 case to contain the designation "debtor in possession."  I believe that the authorization of this use of existing Business Forms, as sought by the Debtor in the Cash Management Motion, is in the best interests of the Debtor's estate, its creditors, and all parties in interest.

37.     Finally, I believe that it is appropriate for the Court to authorize the Debtor to continue to pay the Bank Fees and Investment Advisory Fees, including any prepetition Bank Fees and Investment Advisory Fees. I believe that the material benefit of maintaining the Cash

Management System to avoid disruption and costly delay is warranted in comparison to the relatively modest amount of the Bank Fees and Investment Advisory Fees.