FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                                                       Chapter 11

MADISON SQUARE BOYS & GIRLS CLUB, INC.                Case No. 22-10910 (SHL)

                                 Debtor.
-----------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
*Counsel for the Debtor*
1285 Avenue of the Americas
New York, New York 10019
   By:    Alan W. Kornberg, Esq.
           Andrew M. Parlen, Esq.
           William A. Clareman, Esq.
           John T. Weber, Esq.

**EPIQ CORPORATE RESTRUCTURING, LLC**
777 Third Avenue, 12th Floor
New York, New York 10017
   By:    Kate Mailloux

**LATHAM & WATKINS LLP**
*Counsel for Xclaim Inc.*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
   By:    Kimberly A. Posin, Esq. (*pro hac vice*)

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

In large bankruptcy cases, a claims and noticing agent (a "claims agent") is often retained to assist the Clerk of Court with noticing and claims-processing tasks that the Clerk and court staff would normally perform. The retention of such a claims agent is governed by 28 U.S.C. § 156(c), which permits claims agents to be compensated by the estate for performing these administrative functions. Madison Square Boys & Girls Club, Inc. ("Debtor") seeks to retain Epiq Corporate Restructuring, LLC ("Epiq") as the claims agent in this case. The traditional administrative functions to be performed by Epiq in this case are uncontroversial and not objected to by any party. But as part of its proposed retention here, Epiq also seeks approval for an agreement with Xclaim Inc. ("Xclaim") – a third-party claims-trading website – to synchronize the proofs of claim submitted to Epiq as claims agent with the Xclaim website where such claims are posted for sale. In return, Epiq receives a percentage of the commissions that Xclaim charges for facilitating claims trades on its website.

The issue before the Court is whether Epiq may be compensated by Xclaim for the synchronization services using the data Epiq obtains as claims agent. Because Epiq is acting in its capacity as an agent of the Clerk, the Court concludes that Epiq may not enter into this business arrangement with Xclaim because the Clerk of Court would not be permitted to enter into such a relationship or receive such fees. For the reasons explained below, Epiq's retention application is DENIED to the extent it includes the data-sharing arrangement with Xclaim.

## BACKGROUND

**I.    The Access Agreement**

During the course of bankruptcy cases, a creditor files a proof of claim to assert its right to payment from a bankruptcy debtor. The amount a creditor receives on its claim depends upon

1

the terms of any confirmed chapter 11 plan of reorganization or the statutory waterfall provisions in a chapter 7 case.  Epiq is among the companies preapproved by the Clerk of this Court to serve as a claims agent to handle the receipt and processing of claims.  Epiq has served as a court-approved claims agent in many bankruptcy cases in the Southern District of New York.

On or around June 24, 2022, Epiq entered in the Access Agreement with Xclaim ("Access Agreement"),[1] a company that operates a claims-trading website.  *See generally* Letter submitted by Xclaim CEO Matt Sedigh, dated July 12, 2022 ("Xclaim Letter").[2]  Simply put, claims trading is the purchase and sale of claims held by creditors against a bankruptcy debtor.  It is done outside the supervision of the Court by agreement between private parties, although any transfer of a claim is recorded on the claims register in a bankruptcy case.[3]

Xclaim is in the business of facilitating for its own commercial gain the trading of claims in bankruptcy cases. (Epiq Letter Brief at 1 of 24; Xclaim Letter at 21 of 24).[4]  The purpose of the Access Agreement here is to allow Xclaim to synchronize the claims registers that Epiq administers as the Clerk's claims agent with the claims available for sale on the Xclaim platform.

---

[1]   A copy of the Access Agreement is annexed as Exhibit A to the letter submitted by Epiq's Senior Director Kate Mailloux, dated July 13, 2022 ("Epiq Letter Brief") [ECF No. 55].

[2]   A copy of the Xclaim Letter is annexed as Exhibit B to the Epiq Letter Brief.

[3]   Federal Bankruptcy Rule 3001(e)(2) requires the following to document a claims trade:

**Transfer of Claim Other Than for Security After Proof Filed.**  If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 21 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

[4]   Neither the Epiq Letter Brief nor the Xclaim Letter is paginated.  Therefore, the opinion will reference the page number imprinted by the electronic court filing system on the header of each page.

Xclaim has created custom software ("API") to receive claims information submitted by Epiq "so that [Xclaim] will have real-time information and documents as reflected in each Claims Register." (Access Agreement § 1.1). Epiq, in turn, grants Xclaim direct access to claims registers through the API, and when claims trades occur on the Xclaim platform, Xclaim sends the trade information to Epiq. The Access Agreement provides in relevant part:

> **Access.** EPIQ hereby grants XCLAIM direct access through the API to the [claims-related data] maintained by EPIQ in connection with any Bankruptcy Proceeding and to allow XCLAIM . . . to transmit Claims Transfer Data to EPIQ for its review and approval of any changes to the Claims Registers to reflect any Claim Transfers facilitated through XCLAIM's Platform.

(*Id*. § 2.1).

Under the Access Agreement, Epiq has corresponding obligations to ensure Xclaim's timely access and ongoing synchronization to the claims registers. Epiq must provide Xclaim with direct access to a claims register within three business days of the creation of such register or the filing of the bankruptcy petition, whichever occurs later, (*id*. § 3.1), and Epiq must provide the same when there is any "subsequent modification" to a claims register. (*Id*.). Epiq is also obligated to provide ongoing technical support to Xclaim to ensure that the claims data continues to be transmitted through the API:

> EPIQ agrees to provide XCLAIM with access to EPIQ's systems and to make reasonably available to XCLAIM the services of qualified personnel for assistance and understanding the Technical Data, Claims Registers and Accessible Data in order to enable XCLAIM to develop, test, validate and maintain the API, and gain direct access to the Accessible Data.

(*Id*. § 3.3). When Xclaim transmits claims-trade information to Epiq, Epiq must review it "as soon as practicable" and notify Xclaim within one business day if Epiq sees any issue with the claims trade. (*Id*. § 3.4).

3

In exchange for the synchronization services, Xclaim pays Epiq a fee ("Fee") equal to 10% of the commissions Xclaim receives from users who trade claims on its website in cases in which Epiq serves as the court-approved claims agent. (*Id*. § 4.1). The Fee is paid at the beginning of each year upon Xclaim providing a report to Epiq showing the applicable commissions it collected during the prior year. (*Id*. § 4.2).

The Access Agreement is a successor agreement to a prior "Exclusive Access Agreement," dated October 3, 2019, (*see id*. § 7.5) under which Epiq presumably provided Xclaim the same access and synchronization services but excluded other parties from obtaining the same services.[5] To the Court's knowledge, Epiq has not, prior to the application here, disclosed the existence of its relationship with Xclaim in any of its retention applications filed in other cases in this district after Epiq entered into the Exclusive Access Agreement. *See, e.g.*, Epiq's claims-agent retention applications in (i) *In re Roman Catholic Diocese of Rockville Centre, New York*, dated Oct. 1, 2020 [ECF Case No. 20-12345 Doc. 21]; (ii) *In re Grupo Aeroméxico, S.A.B. de C.V.*, dated July 1, 2020 [ECF Case No. 20-11563 Doc. 12]; and (iii) *In re Jason Indus., Inc.*, dated June 24, 2020 [ECF Case No. 20-22766 Doc. 5].

Notably, Epiq represents to Xclaim in the Access Agreement that Epiq has exclusive ownership rights over the claims registers in cases where Epiq serves as claims agent. (Access Agreement § 5.5 ("EPIQ exclusively owns all right, title and interest in and to the Claims Registers free and clear of any encumbrances, security interests, notes, loans, instruments, liens, judgments, orders, decrees, commitments, liabilities, licenses, agreements or other binding arrangements or obligations between EPIQ and any other person or entity that conflict with the

---

[5] The Access Agreement drops the exclusivity provision so, at least in theory, Epiq could enter into similar agreements with other claims-trading platforms. While the exclusivity provision made the agreement even more problematic, the Court concludes that the Access Agreement is improper even without the exclusivity provision.

4

rights granted by EPIQ under this agreement."); *id*. § 2.2 ("As between the Parties, EPIQ shall continue to own all rights in and to . . . the Claims Registers . . . .")).

## II.   The Retention Application

On June 29, 2022, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code and contemporaneously moved to appoint Epiq as its claims agent. In her declaration supporting Epiq's retention, Kate Mailloux – an Epiq Senior Director – disclosed the existence of Epiq's agreement with Xclaim and stated that the Fee compensates Epiq for costs incurred in preparing the claims register "in a digital format that is compatible with Xclaim's platform." *Declaration of Kate Mailloux*, dated June 29, 2022 at ¶ 9 [ECF No. 2]. During the first day hearing in this case on July 1st, the Court requested a letter brief on the propriety of the Access Agreement and the Fee, *see Transcript of July 1, 2022 Hr'g* at 53:13-25 [ECF No. 84], and approved Epiq's retention application only on an interim basis subject to the additional briefing and further hearing.

In the subsequent Epiq Letter Brief, Epiq provided a copy of the Access Agreement and the Xclaim Letter. Epiq primarily argued that, under the Access Agreement, it "is not acting in its capacity as an agent of the Clerk but rather in its capacity as a private, for-profit enterprise." (Epiq Letter Brief at 3 of 24). At the second day hearing on July 20th, the Court by bench ruling denied the retention application to the extent it included the file-sharing arrangement with Xclaim, *see Transcript of July 20, 2022 Hr'g* at 44:6-47:17; 50:9-12; 52:24-53:4 [ECF No. 82], and previewed that it may issue a written opinion to more fully explain the Court's reasoning.[6] *Id*. at 49:1-4. This is that written opinion.

---

[6]   The Court subsequently approved Epiq's retention with an express provision excluding this case from the file-sharing arrangement with Xclaim. *See* Order, dated July 29, 2022 [ECF No. 86].

5

## DISCUSSION

I.     **Applicable Statutes and Authorities**

    A.     **28 U.S.C. § 156(c) and the SDNY Protocol**

The Clerk is the "official custodian of the records and dockets of the bankruptcy court." 28 U.S.C. § 156(e). When it appears that there will be a distribution to unsecured creditors, the Clerk must "keep in a claims register a list of claims filed in a case." FED. R. BANKR. P. 5003(b). The authority to retain a claims agent to assist the Clerk comes from 28 U.S.C. § 156(c), which states in pertinent part:

> Any court may utilize . . . services . . . off the court's premises, which pertain to the provision of notices, dockets, calendars, and other administrative information to parties in [bankruptcy cases], where the costs of such . . . services are paid for out of the assets of the estate and are not charged to the United States. The utilization of such . . . services shall be subject to such conditions and limitations as the pertinent circuit council may prescribe.

Thus, a claims agent may be retained in a bankruptcy case to assist the Clerk with certain administrative tasks and be compensated by the bankruptcy estate.

In this District, a claims agent must be retained in any case when the number of creditors and equity security holders, in total, is 250 or more. Bankr. S.D.N.Y. R. 5075-1(b)(1). The claims agent remains "subject to the supervision of the Clerk," Bankr. S.D.N.Y. R. 5075-1(a), and the Clerk "remains responsible for the integrity of the court's records and dockets, including those maintained by claims and noticing agents." 9 COLLIER ON BANKRUPTCY ¶ 5003.04 (16th ed. 2022); *accord* 28 U.S.C. § 156(e).

A claims agent's administrative activities and duties are further governed by this Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) ("SDNY

Protocol").[7] Consistent with a claims agent's defined grant of authority under section 156(c), the SDNY Protocol provides that the claims agent activities should not extend beyond the notice and processing tasks that the Clerk of Court may perform:

> An application seeking to retain a claims and noticing agent under 28 U.S.C. § 156(c) . . . should be *limited in scope* to those duties that would be performed by a Clerk of Court with respect to providing notice and processing claims (such as maintaining a claims register).

SDNY Protocol at 1 (emphasis added). The limited scope of a retention under section 156(c) is also highlighted by this Court's Form Application for an Order Authorizing Retention and Appointment of Claims and Noticing Agent ("Form 156(c) Retention Application"):

> This Section 156(c) Application pertains only to the work to be performed by Claims and Noticing Agent under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and S.D.N.Y. LBR 5075-1, and any work to be performed by Claims and Noticing Agent outside of this scope is not covered by this Section 156(c) Application or by any Order granting approval hereof.

*See* Form 156(c) Retention Application at ¶ 5.[8] Consistent with this limited scope, this Court's form application for retention of claims agents under section 156(c) details the agent's permitted activities relating to noticing and claims management, *see* Form 156(c) Retention Application at ¶ 5(a) – (s) (collectively, "156(c) Activities"), and includes "[r]ecord[ing] all transfers of claims and provid[ing] any notices of such transfers as required by Bankruptcy Rule 3001(e)." *Id*. at ¶ 5(k). A claims agent retained to perform 156(c) Activities has a "duty to comply with all relevant statutory provisions and rules of procedure, including local rules of procedure, general orders and applicable guidelines." SDNY Protocol ¶ 3. The SDNY Protocol further states that

---

[7] A copy of the SDNY Protocol is available on the Court's website at https://www.nysb.uscourts.gov/sites/default/files/pdf/newClaimsAgentsProtocol.pdf.

[8] The Form 156(c) Retention Application as well as other forms used by this Court with respect to claims agent retention and termination can be found on the Court's website at https://www.nysb.uscourts.gov/claims-agent-forms.

7

failure to comply with its terms "may lead to removal of the claims and noticing agent's name from the list of approved agents." SDNY Protocol at 2.

Separate from any retention under section 156(c), a claims agent is sometimes also retained under 11 U.S.C. § 327(a) in large cases to perform administrative services for the debtor including the preparation of schedules, acting as balloting and tabulation agent, or distributing assets under a plan of reorganization (collectively, "327(a) Activities").[9] The SDNY Protocol distinguishes the 156(c) Activities that a claims agent performs *as an agent of the Clerk* from the 327(a) Activities that a claims agent performs on *behalf of the debtor*; a separate application and order is required for each retention:

> The Section 156(c) Application should exclude those duties that would *not* be performed by a Clerk of Court [including the 327(a) Activities]; such services should be the subject of a *separate* application to and order of the Court.

SDNY Protocol at 1 (emphases in original).

### B.    Code of Conduct for Judicial Employees

The Clerk is subject to the Code of Conduct for Judicial Employees ("Code of Conduct") which consists of five Canons. *See Guide to Judiciary Policy*, Vol. 2, Pt. A, Ch. 3. Canon 2 of the Code of Conduct requires the Clerk to avoid impropriety and the appearance of impropriety. It states in relevant part:

> **Canon 2:  A Judicial Employee Should Avoid Impropriety and the Appearance of Impropriety in All Activities**
>
> A judicial employee should not engage in any activities that would put into question the propriety of the judicial employee's conduct in carrying out the duties of the office. . . . A judicial employee should not lend the prestige of the

---

[9]    11 U.S.C. § 327(a) permits a bankruptcy trustee to "employ one or more . . . professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties," and 11 U.S.C. § 1107(a) gives the same power to a debtor-in-possession in a chapter 11 case.

8

office to advance or to appear to advance the private interests of others.  A judicial employee should not use public office for private gain.

Further, the Clerk could not contract with a third party, like Epiq, to perform a task that the Clerk himself could not perform.  PRINCIPLES OF FED. APPROPRIATIONS LAW, Chapter 3, p. 3-13 (United States Government Accountability Office, Office of the General Counsel) (4th ed. 2017) ("Brief mention should also be made of the axiom that an agency cannot do indirectly what it is not permitted to do directly.  Thus, an agency cannot use the device of a contract, grant, or agreement to accomplish a purpose it could not do by direct expenditure.").

### C.    Fees a Clerk May Charge

The ability of a Clerk of a bankruptcy court to collects fees is limited to fees authorized under 28 U.S.C. § 1930.  *See* 28 U.S.C. § 1930(e) ("The clerk of the court may collect only the fees prescribed under this section.").  The permitted fees are specifically broken down in detail in subparts of section 1930.  Section 1930(a)(1) through (a)(5) of Title 28 sets forth the fees payable to the Clerk when commencing bankruptcy cases under different chapters of the Bankruptcy Code, section 1930(c) describes fees charged when commencing an appeal, and section 1930(b) provides that additional collectable fees may be prescribed by the Judicial Conference of the United States under section 1914(b).  The additional fees contemplated by section 1914(b) are set forth in extensive and painstaking detail in the Bankruptcy Court Miscellaneous Fee Schedule ("Miscellaneous Fee Schedule").[10]  Of relevance to the application here, the Miscellaneous Fee Schedule includes (i) a $26 fee ("Claim Transfer Fee") for filing a transfer of claim, *see* Miscellaneous Fee Schedule ¶ 20, and (ii) a $31 fee ("Electronic Copy Fee") for providing a copy of an "electronic record stored outside the court's electronic case

---

[10]    A copy of the Miscellaneous Fee Schedule is available at https://www.uscourts.gov/services-forms/fees/bankruptcy-court-miscellaneous-fee-schedule.

management system, including but not limited to, document files, audio recordings, and video recordings . . . ." *Id.* ¶ 1(b). These fees are paid to the Treasury Department and split between the Treasury's general fund and a special fund from which proceeds are available to offset funds appropriated for the operation and maintenance of federal courts. *See* Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, § 102, 114 Stat. 2410, 2411; *see also Guide to Judiciary Policy*, Vol. 4, Ch. 6 § 610.20(b).

## II. The Access Agreement is Improper

### A. The Access Agreement Requires Epiq to Perform Tasks that the Clerk Could Not Perform and Receive a Fee that the Clerk Could Not Collect

Epiq here seeks to be retained under section 156(c). As a claims agent under section 156(c), Epiq's authority to act is derivative of the Clerk's authority. As provided in the SDNY Protocol, Epiq's duties are "limited in scope to those duties that would be performed by the Clerk of Court with respect to providing notice and processing claims (such as maintaining a claims register)," *viz.*, the 156(c) Activities.

Epiq's obligations and duties under the Access Agreement clearly go beyond the 156(c) Activities. Under the agreement, Epiq synchronizes the claims registers in bankruptcy cases with Xclaim's claims-trading platform via the API, (Access Agreement § 2.1), within three days of the creation of the claims register or filing of the bankruptcy petition (*id*. at 3.1), provides ongoing technical support to Xclaim (*id*. at § 3.3), and promptly reviews and approves claims-trade data submitted by Xclaim. (*Id*. at § 3.4). These services are not part of the Clerk's obligation under Federal Bankruptcy Rule 5003(b) to "keep in a claims register a list of claims filed in the case," and to perform related administrative functions in the maintenance of the claims register. Rather, the purpose of these services is to assist Xclaim – a for profit claims trader – by providing electronic information about the entire claims register so that it can be

10

synchronized with Xclaim's website to facilitate trades between creditors and potential claims purchasers.

Said another way, the Clerk cannot engage in a for-profit relationship solely to benefit Xclaim. If the Clerk contracted with Xclaim to synchronize claims registers with Xclaim's platform, the Clerk would be in violation of Canon 2 of the Code of Conduct prohibiting the Clerk from "lend[ing] the prestige of the office to advance or to appear to advance the private interests of others."[11] Moreover, if the Clerk was paid the Fee in exchange for the synchronization services, he would undoubtedly run afoul of Canon 2's prohibition against using the public office "for private gain."[12] As a claims agent, the Clerk may only collect fees that are permitted under 28 U.S.C. § 1930, and there is no provision in section 1930 or the Miscellaneous Fee Schedule for providing the type of ongoing synchronization services and related technical support contemplated by the Access Agreement. Since the Clerk could not enter into the Access Agreement, it must follow that his agent – Epiq – cannot. PRINCIPLES OF FED. APPROPRIATIONS LAW, Chapter 3, at 3-13.

Epiq's and Xclaim's arguments do not change the result. First, Epiq asserts that the limitations set forth in 28 U.S.C. § 156(c) do not apply to its relationship with Xclaim because it is acting in its capacity as a private, for-profit business rather than as an agent of the Clerk. (Epiq Letter Brief at 3-4 of 24). But Epiq misconstrues the scope of a retention under section 156(c). The SDNY Protocol makes clear that the 156(c) Activities include "maintaining a claims

---

[11] This violation would be even more severe under an exclusive access agreement.

[12] Obviously, claims agents are private companies who are entitled to be compensated for their performance of the 156(c) Activities. But the 156(c) Activities that a claims agent may perform are limited to activities the Clerk would normally perform without additional compensation. Synchronizing claims data with a private, for-profit entity is not an activity the Clerk could engage in. Thus, the Clerk's receipt of a third-party fee to engage in an otherwise unauthorized activity would violate the prohibition against using his office for private gain.

11

register," and the Form 156(c) Retention Application further specifies that this includes

"[r]ecord[ing] all transfers of claims and provid[ing] any notices of such transfers as required by

Bankruptcy Rule 3001(e)."[13]  Form 156(c) Retention Application ¶ 5(k).  Indeed, the Debtor's

motion to retain Epiq makes clear that the retention is for services under section 156(c).  *See

Debtor's Application for Entry of an Order Authorizing Retention and Appointment of Epiq

Corporate Restructuring, LLC as Claims and Noticing Agent under 28 U.S.C. § 156(c), 11

U.S.C. § 105(a), and Local Rule 5075-1 and Granting Related Relief*, dated June 29, 2022 at ¶ 8

[ECF No. 2].

    Epiq would not have the data that Xclaim seeks but for Epiq's retention under section

156(c).  Notwithstanding Epiq's representations in the Access Agreement, Epiq has no

ownership interest to the claims data.  Such data belongs to the U.S. Courts as the Clerk of Court

is the official custodian of court records, 28 U.S.C. § 156(e), and the Clerk remains responsible

for the data even when an agent is retained to assist him with administrative tasks.  9 COLLIER ON

BANKRUPTCY ¶ 5003.04; *see also* Bankr. S.D.N.Y. R. 5075-1(a) (claims agents are subject to

Clerk's supervision).  At the closing of a case, the claims agent must provide the Clerk with the

final version of the claims register and send all original proofs of claim to the Federal Records

Center of the National Archives and Records Administration located in Lee's Summit, Missouri

or to another location as designated by the Clerk.  Form 156(c) Retention Application ¶ 5(r) &

---

[13] For trades performed outside of the Xclaim platform, Epiq would presumably fulfill this obligation by reviewing the notice of transfer filed by the transferee, sending the appropriate notice under Federal Bankruptcy Rule 3001(e) to the transferor, and updating the claims register in the absence of an objection.  For trades facilitated through Xclaim, Epiq relies on the claims-trade data transmitted by Xclaim as outlined in the Access Agreement to update the claims register.  In other words, for the subset of claims trades involving Xclaim, the Access Agreement is the means under which Epiq "record[s] . . . transfers of claims and provide[s] any notices of such transfers as required by Bankruptcy Rule 3001(e)" – an obligation it has pursuant to its retention under 28 U.S.C. § 156(c).  (*See* Access Agreement at 1 ("XCLAIM desires . . . to provide EPIQ with the means of reviewing such Claims Transfer Data to allow EPIQ to quickly and efficiently approve updates to the Claims Registers to reflect such transactions.")).

12

(s). Even when the claims data is stored in the Federal Records Center, such data remains in the legal custody of the judiciary. *Guide to Judiciary Policy*, Vol. 10, Ch. 6, § 635.20. Indeed, the Clerk may request the return of any claims data stored in the Federal Records Center, *id*. § 635.40, and the Clerk must provide written authorization to the Federal Records Center prior to the disposal or transfer of the claims data. *Id*. § 635.30. But for Epiq's ability to manage and administer the claims register as the Clerk's agent under 28 U.S.C. § 156(c), Epiq could not provide the synchronization services under the Access Agreement.

Second, Epiq suggests that the SDNY Protocol permits Epiq to enter into the arrangement with Xclaim because it (i) contemplates a separate engagement to perform other administrative tasks for the debtor (*i.e.*, the 327(a) Activities), and (ii) is silent on any other services Epiq may provide "to the public or third parties at the option of the claims agent – for example, Epiq's election to provide access to claims register data in a digital format compatible with Xclaim's platform." (Epiq Letter Brief at 4 of 24). As a threshold matter, Epiq's position fails because the Debtor has not moved under 11 U.S.C. § 327(a) to retain Epiq to help Xclaim facilitate claims trades. Moreover, the proposed arrangement here provides a benefit to Xclaim – and presumably to Epiq by virtue of the Fee – but not to the Debtor as contemplated by section 327. In any event, an application under section 327(a) would not be appropriate given that Epiq only has the relevant information because of its role as a claims agent under section 156(c). Indeed, the SDNY Protocol and 28 U.S.C. § 156(c) place *affirmative limitations* on the administrative tasks that a claims agent may perform with the information it acquires. These limitations mean that the claims agent, in relation to its management of the claims register, is not free to engage in other activities as part of its claims agent role if those activities are not included in section 156(c) and the protocol.

Third, Xclaim argues that it is unfair to deprive it of access to this information. (Xclaim Letter at 22-24 of 24). But Xclaim's complaint isn't about access; it has the same access to information about filed claims as any member of the public. Xclaim's real complaint is not being able to obtain this information in its preferred electronic format, a format that is best for its online claims trading business. (Xclaim Letter at 23 of 24 (complaining that claims data as displayed on the claims agent websites is not made available in the "digitally accessible format" that would enable it to synchronize such data to its platform)). The claims data that Epiq generates in the ordinary course of business as a claims agent does not satisfy Xclaim's needs; it wants Epiq to take the additional step of processing the data into Xclaim's preferred electronic format, and Xclaim is willing to pay for that service. But the Clerk of Court could not receive a fee to process this claims data simply to further Xclaim's private interest. *See* Code of Conduct, Canon 2 (the Clerk should avoid the appearance of impropriety in all activities and should not lend the prestige of the office to advance the private interests of others). And as the Clerk's agent, neither can Epiq.[14]

Fourth, Epiq asserts that the Fee is authorized because the Miscellaneous Fee Schedule includes a $31 fee (*i.e.*, the Electronic Copy Fee) collectable for providing an electronic copy of a court record. (Epiq Letter Brief at 5 of 24). But the fees set forth in 28 U.S.C. § 1930 and the Miscellaneous Fee Schedule are collected by the Clerk and deposited with the Treasury. Collection of such fees is a Clerk's office function. For instance, the $26 Claim Transfer Fee

---

[14] Epiq and Xclaim also make a policy argument that having a centralized platform from which to buy and sell bankruptcy claims ultimately inures to the benefit of creditors particularly those seeking to sell their claim in the short term. (Epiq Letter Brief at 7 of 24; *see generally* Xclaim Letter). In the end, however, "even the most formidable policy arguments cannot overcome a clear statutory directive," *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021) (citation and internal quotation marks omitted), and the means under which Epiq and Xclaim sought to further their objective were in plain violation of 28 U.S.C. § 156(c) and the SDNY Protocol.

which must be paid each time a trade is executed is paid to the Clerk, not the claims agent. Epiq has not provided authority for the proposition that it is entitled to keep for itself the fees that are paid to the Clerk by statute. Even assuming that a claims agent could collect such statutory fees, the Fee compensates Epiq for ongoing synchronization services and related technical support. It is not paid for a single electronic copy of a court record.[15]

Lastly, Epiq asserts that the Fee from Xclaim is not subject to the prices set forth in 28 U.S.C. § 1930 and the Miscellaneous Fee Schedule. (Epiq Letter Brief at 5-6 of 24). Epiq points out that the SDNY Protocol requires a debtor to solicit engagement proposals from at least three preapproved claims agents each of whom could charge different rates. *See* SDNY Protocol ¶ 1. Epiq's argument fails, however, because it conflates (i) the rates Epiq may charge the estate in the performance of the 156(c) Activities with (ii) the Fee Epiq would receive from Xclaim here. There is no dispute that Epiq may set its own competitive rates for the performance of the 156(c) Activities as the Clerk's agent to be paid by the estate. That is not at issue in this case. Instead, the issue is that the Access Agreement requires Epiq to perform activities that the Clerk could not engage in, in exchange for a third-party fee that the Clerk could not charge, and that is paid from a source not authorized under 28 U.S.C. § 156(c).[16]

---

[15] It is also not clear what the fee for an electronic copy of a claims register would be. While the Electronic Copy Fee is $31 "per record provided," Xclaim seeks an electronic copy of all the information in each proof of claim.

[16] Section 156(c) of Title 28 permits a claims agent to be compensated for its services "out of the assets of the estate." Under the Access Agreement, the claims agent receives compensation from Xclaim, not the debtor. Therefore, Epiq's receipt of the Fee violates 28 U.S.C. § 156(c) because it is paid by an unauthorized third party.

The terms of the Access Agreement might also place Epiq outside the definition of a "disinterested person" under 11 U.S.C. § 101(14). *See* SDNY Protocol at 2 (requiring a claims agent to be a disinterested person). A "creditor" is not a disinterested person under section 101(14)(A) because "[i]t is presumed by the statute that a person who is a creditor . . . is incapable of the impartial judgment required of a professional in the conduct of a case under the Code." 3 COLLIER ON BANKRUPTCY ¶ 327.04[2][a][iii][C]. While Epiq is not a creditor as defined in 11 U.S.C. § 101(10), Epiq stands to benefit monetarily from the case from something other than its professional fees. Specifically, Epiq has a pecuniary interest in maximizing the volume of claims trades in a case to increase the

15

## CONCLUSION

For the reasons stated, Epiq may not be retained as the Clerk of Court's claims agent to the extent the terms of the Access Agreement apply to the claims register in this case.

Dated: New York, New York
      August 18, 2022

                                     */s/ Sean H. Lane*
                                     UNITED STATES BANKRUPTCY JUDGE

---

amount of the Fee. As the Court is denying the current retention on other grounds, however, it need not resolve the question of disinterestedness.

16