Alan W. Kornberg, Esq.
Andrew M. Parlen, Esq.
William A. Clareman, Esq.
John T. Weber, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MADISON SQUARE BOYS & GIRLS CLUB, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 22-10910 (SHL)<br><br>Re: Docket Nos. 200; 257; 269; 275; 277 |

**DEBTOR'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING,
(B) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, AND (C) PAY BREAK-UP FEE AND EXPENSES, (II) MODIFYING
AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF**

---

[1] The last four digits of the Debtor's federal tax identification number are 6792. The Debtor's mailing address is 250 Bradhurst Avenue, New York, New York 10039.

The above-captioned debtor and debtor in possession (the "Debtor") hereby files this reply in further support of the Motion[1] and in response to the Committee's objection thereto [Docket No. 275] (the "Committee Objection"). In support of the Motion and this reply, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1. The DIP Facility is critical to the Debtor's survival. Rather than premature, as the Committee suggests, the DIP Facility is long overdue. The Debtor is already in arrears on administrative costs to the tune of approximately $2.2 million (a situation hardly helped by the Committee Objection), and the Debtor simply cannot continue to administer this chapter 11 case without third party financing. None of this is a surprise to the Committee—the Debtor has been completely transparent regarding its financial situation from the outset of this chapter 11 case[2] and, as the Committee knows, began negotiating with potential lenders seven months prior to the petition date to obtain a debtor-in-possession loan on the most favorable possible terms. Indeed, even after securing a loan commitment from SummitBridge National Investments VIII LLC ("Summit") and filing the Motion to seek approval thereof, the Debtor worked in parallel to reach an agreement with Carver Federal Savings Bank ("Carver") on an alternative loan—resulting in the DIP Facility before the Court—with materially better economics and more flexibility for the Debtor to pursue a successful resolution of this case.

---

[1] *Debtor's Motion For Entry of a Final Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Modifying Automatic Stay, and (III) Granting Related Relief* [Docket No. 200] (the "Motion"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or the revised form of order filed at Docket No. 277 (the "Proposed DIP Order").

[2] *See Declaration of Jeffrey Dold (I) In Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 10] (the "First Day Declaration").

2.      The Committee Objection mainly airs philosophical grievances asserting that the primary purpose of the DIP Facility is to compensate lenders and professionals with no tangible benefit to Madison's operations or the survivors. Instead, the Committee proposes that the Debtor wait until it exits from chapter 11. That would make no sense. The reason the Debtor is seeking approval of the DIP Facility *now* is because the Debtor needs liquidity *now* to avoid incurring obligations that it cannot pay and the possibility of liquidation. The proposed uses of the DIP Facility constitute the actual and necessary expenses of the estate, including payment of the Break-Up Fee and Expense Reimbursement, which were the negotiated costs to secure a financing commitment from Summit and leverage it into a more favorable commitment from Carver. And despite the Committee's insistence to the contrary, the Debtor *cannot* continue to incur obligations that it cannot repay.

3.      The Committee's focus on the timing of the DIP Facility is misguided and undermines its purported goal of maximizing value for the survivors. No matter *when* the Debtor incurs the debt, administrative expenses, such as they are, will have to be paid. The only relevant question is *how much* of the DIP Facility's proceeds can be saved for other purposes. The answer largely depends on the speed of the case and the number of wasteful distractions (like the Committee Objection) that slow it down. The Debtor has finite resources and every day in chapter 11 depletes the pot. Thus, the quicker the Debtor can exit chapter 11, the more flexibility it has to consider whether and how it can utilize its available resources for creditor recoveries without risking the future of the Debtor's charitable mission.

4.      The Debtor wholly agrees with the Committee that the purpose of this chapter 11 case is not to "accrue and pay the fees and expenses of estate professionals or interest and fees to the DIP Lender." *See* Comm. Obj. ¶ 9. As the Committee well knows, the Debtor orchestrated its

entire restructuring strategy to minimize time spent in chapter 11, and to reduce the corresponding professional fees. For more than a year prior to the petition date, the Debtor and its advisors sought repeatedly to engage with, among other key constituents, an ad hoc group representing over 80% of the abuse survivors on the terms of a prearranged case, including providing access to a data room with information and documentation concerning the Debtor's financial, insurance, and asset profile, conducting numerous diligence calls, and sharing proposals on October 25, 2021 and on March 7, 2022 regarding the framework and economic terms of a potential restructuring.[3]

5. Throughout these communications, the Debtor stressed *ad nauseum* (and provided documentation to evidence) its dire financial circumstances, its inability to survive a litigious or drawn-out process, and the danger of using the "playbooks" of other prolonged CVA-related chapter 11 cases to dictate the direction of this one. When the Debtor's prepetition proposals were not responded to, it pivoted to chapter 11 out of necessity, but again sought to implement a strategic process that minimized wasteful expenditures. This was accomplished through a Court-ordered temporary stay of unnecessary proceedings and an immediate focus on mediation to reach a resolution. Since then, the Debtor has diligently and timely complied with every step of the mediation process while endeavoring to reduce costs in other aspects of the chapter 11 case. To submit that the Debtor's focus in this case is misplaced is a gross distortion of the record that benefits no one.

6. Any further delay in gaining access to the DIP Facility puts the Debtor's estate at risk to the detriment of all parties in interest without any discernable upside for the survivors. *First*, without the certainty of financing, the Debtor must evaluate whether to continue this chapter 11 case or consider liquidation alternatives. Pursuing the latter would be a tragic outcome

---

[3]   *See* First Day Decl. ¶ 59-60.

for the children and families that the Debtor serves, and would leave survivors to contend with years of uncertain litigation that undoubtedly would yield less value than under a consensual chapter 11 plan.

7.      *Second*, the DIP Lender's commitment expires on November 15, 2022 and the Debtor has no alternative source of financing or any assurances of obtaining one. The Committee blithely posits that the Debtor should wait until some undetermined date in the future to line up liquidity. Even ignoring the Debtor's immediate need for financing to continue the reorganization process, given the state of the financing markets, recent interest rate increases, and the challenges faced by non-profit institutions in obtaining credit, it is hard to imagine that terms as favorable as those committed to by Carver will ever again come the Debtor's way.

8.      *Third*, the Forbearance Agreement with the PNC-affiliated lenders expires on November 11, 2022 and such lenders conditioned a further extension on approval of the DIP Facility. The Debtor needs the DIP Facility ***now***, and cannot wait any further and risk losing its only option for DIP ***and*** exit financing (one that took months and months to finalize), ***and*** put its headquarters and flagship clubhouse at risk.

9.      In addition to expressing its general displeasure, the Committee lodges a series of complaints to select terms of the DIP Facility without critically analyzing whether such concerns apply to this particular circumstance. Most conspicuously, the Committee suggests that the DIP Facility should be denied as "too expensive and onerous for the Debtor's estate." Comm. Obj. ¶ 27. This characterization is simply not true. The DIP Facility contains highly favorable and, in some instances, ***well below-market*** economic terms and the opportunity to convert the DIP Facility into a ten-year exit loan without incurring additional commitment or closing fees.

4

10. Tellingly, while the Committee asserts the DIP Facility is "too expensive," the Committee Objection does not point to any alternative or comparable financings or the related economics of such financings to support its bald assertion. This is because none exists.[4] The only other financing available to the Debtor—from Summit—was much more expensive and limited the Debtor's optionality without any commitment for an exit facility. Furthermore, compared to the Summit facility, the Debtor will save at least $185,000 on interest and fees over the next four months and likely much more because the need to identify and secure exit financing has been eliminated by Carver. The DIP Facility is a slam-dunk economic win for the Debtor and its stakeholders, and the Debtor had hoped that the Committee would rejoice in the outcome rather than waste precious resources on its ill-conceived objection.

11. Nevertheless, the Debtor is committed to continue working with the Committee to forge a path toward a global resolution and is optimistic that the parties will reach such result, but the simple fact is that the Debtor requires funding to continue this effort and the DIP Facility will help the parties facilitate reaching the Committee's goals rather than impede them. The DIP Facility represents the Debtor's best option for financing and the Debtor's decision to pursue it is a proper exercise of its business judgment. Accordingly, the Debtor respectfully requests that the Court overrule the Committee Objection and grant the Motion.

---

[4] It is worth noting that securing debtor-in-possession financing for a not-for-profit organization with little cash flow and assets subject to a myriad of use and other restrictions and facing significant litigation was, in fact, quite challenging.

5

## ARGUMENT

### I. THE DEBTOR PROPERLY EXERCISED ITS BUSINESS JUDGMENT IN ENTERING INTO THE DIP FACILITY

12. The Debtor, in its business judgment, concluded that the DIP Facility is "reasonable under the circumstances and . . . is in the best interests of the Debtor's estate." Chiu Decl.[5] ¶ 15-16. "Courts have generally deferred to a debtor's business judgment in granting section 364 financing." *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (citing cases); *see also U.S. Bank Trust Nat'l Assoc.* v. *Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013), *aff'd,* 730 F.3d 88 (2d Cir. 2013) ("[i]n determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); *In re Barbara K Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("[A court's] normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."). Here, the Debtor's reasonable business judgment should not be disturbed, because the DIP Facility certainly is not leveraging the bankruptcy process nor ceding control of the reorganization process to one party in interest. To the contrary, the DIP Facility is necessary to continue the Debtor's efforts toward reaching agreement on a consensual plan.

13. "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence . . . [and] will uphold the board's decisions as long as they are attributable to any rational business purpose . . . Parties opposing the proposed exercise of a

6

debtor's business judgment have the burden of rebutting the presumption of validity." *Off. Comm. of Subordinated Bondholders* v. *Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal citations omitted); *see also In re 8 W. 58TH St. Hosp., LLC*, 2017 WL 3575856, at *3 (Bankr. S.D.N.Y. Aug. 4, 2017). The deferential business judgment standard will be satisfied "as long as the proposed action *appears* to enhance the debtor's estate." *Crystalin, LLC* v. *Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (emphasis in original, internal alterations and quotations omitted).

14. Entry into the DIP Facility is a straightforward exercise of the Debtor's reasonable business judgment. The DIP Facility is far and away the best option available to the Debtor and is the result of extensive, good faith, and arm's-length negotiations with the DIP Lender, as well as a broad and rigorous marketing process to search for the most favorable terms for the Debtor. Indeed, the Debtor and its advisors spent months proactively canvassing lenders willing to provide postpetition financing options for a distressed not-for-profit organization that lacks both a regular income stream and a significant asset base unencumbered by various forms of use, purpose, or transfer restrictions—a small universe to be sure.

15. Only a handful of parties expressed any interest in advancing a loan, and only two, Carver and Summit, executed commitment letters with the Debtor. As described in the Supplemental Chiu Declaration,[5] at the time the Motion was filed, the Debtor believed that Carver's commitment, while more economically favorable, was not then executable and that Summit was the only available option under the circumstances. Summit had, however, agreed that the Debtor

---

[5] *Supplemental Declaration of Robin Chiu in Support of the Debtor's Motion for Entry of a Final Order Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, and (C) Pay Break-Up Fee and Expenses, (II) Modifying Automatic Stay, and (III) Granting Related Relief* [Docket No. 269] (the "Supplemental Chiu Declaration").

could subsequently pivot to an alternative financing arrangement in exchange for the payment of a $50,000 break-up fee (the "Break-Up Fee") and the reimbursement of Summit's fees and expenses (the "Expense Reimbursement"), less a $25,000 deposit.[6]

16. More than a month after filing the Motion, the Debtor reached agreement with Carver on the DIP Facility, which contained materially better terms than the Summit facility, including a below-market interest rate, less expensive fees and, significantly, an option to convert the DIP Facility into an exit term loan. The DIP Facility provides the Debtor with ample flexibility and runway to continue its focus on achieving a resolution with the Committee and this liquidity infusion is critical to the Debtor's continued survival in chapter 11. Without the DIP Facility, the Debtor would have no means to fund this chapter 11 case going forward and would be forced to consider value-destructive liquidation alternatives.

## II. THE COMMITTEE'S OBJECTIONS TO THE DIP FACILITY LACK MERIT AND SHOULD BE OVERRULED[7]

### A. The Committee Fails to Overcome the Presumption That the Debtor Satisfied the Business Judgment Standard

17. The Committee lodges a wholesale attack on the DIP Facility that consists of the following complaints: (a) the primary purpose of the DIP Facility is to pay professional and lender fees, (b) loans should instead be incurred at exit and used to pay the survivors, and

---

[6] The Committee's assertion that the Debtor only sought approval of the Break-Up Fee and Expense Reimbursement *after* the Debtor decided to pursue an alternative financing arrangement is false. *See* Comm. Obj. ¶ 29. The Debtor sought approval thereof in the Motion, which was filed more than a month before the Debtor's pivot to Carver. *See* Motion ¶ 6(d)-(e). While the Debtor could have sought pre-approval of the Break-Up Fee and Expense Reimbursement in a separate motion, the Debtor, with the consent of Summit, chose to conserve limited estate resources and only seek approval in connection with the Motion if the Debtor did, in fact, proceed with alternative financing.

[7] In addition to the matters addressed herein, the Committee objects to allowing the DIP Lender to satisfy its superpriority claim from proceeds of certain assets, including avoidance actions, or seeks to have the DIP Lender look to those assets last. In response, the DIP Lender has agreed not to seek recovery from Excluded Assets, including avoidance actions, insurance policies to the extent they provide coverage with respect to the CVA-related litigation, and the proceeds thereof. The Proposed DIP Order reflects this concession.

8

(c) the DIP Facility will undermine any potential resolution with the Committee because it encumbers the Debtor's real estate assets. These complaints are merely distractions that do not advance this case and are certainly insufficient to overcome the presumption that the Debtor properly exercised its reasonable business judgment.

18.     *First*, all intended uses of the proceeds of the DIP Facility constitute the actual and necessary expenses of the estate, including (a) postpetition professional fees, (b) fees and expenses of the DIP Lender, (c) quarterly fees payable to the U.S. Trustee, (d) necessary capital expenditure projects (estimated to cost over $900,000), and (e) the Break-Up Fee and Expense Reimbursement. In addition, the reserves to be established under the DIP Facility were a critical part of the financing package and will be funded solely from the proceeds of the DIP Facility; the DIP Lender simply would not have committed to a loan of this size without those reserves in place.

19.     That the majority of DIP Facility proceeds are earmarked for professional and lender fees and expenses does not undermine its necessity. Payment of administrative expenses is a required and fundamental feature of any chapter 11 case. Indeed, the Debtor's board of directors would not allow the Debtor to risk administrative insolvency by continuing to incur postpetition obligations it cannot satisfy without the certainty of financing. *See, e.g., In re BH S & B Holdings, LLC*, 439 B.R. 342, 349-50 (Bankr. S.D.N.Y. 2010) (concluding that "the Debtors' administrative insolvency constitutes cause to convert these cases" upon finding, among other things, that the debtors had $2,704,976 of unrestricted cash on hand, had not paid professional fees totaling $2,188,902, and that "if these cases were to proceed in chapter 11, there is no doubt that the amount of unpaid professional fees would continue to grow."). Simply put, the Debtor's reorganization efforts would be imperiled if the DIP Facility is not approved.

9

20. Moreover, using DIP Facility proceeds to satisfy the Debtor's administrative obligations is entirely unremarkable. In *In re MSR Hotels & Resorts, Inc.,* this Court addressed a similar objection and did not find it compelling. Hr'g Tr., Oct. 1, 2013, Case No. 13-11512 (SHL) (Bankr. S.D.N.Y.). There, a party objected to the proposed financing facility on, among other grounds, the basis that proceeds of the facility were primarily earmarked for the payment of professional fees. The Court found that such objection was not grounds for denying the proposed financing, because (a) the debtor needed to fund its wind-down process, (b) denial "would leave the debtor in a situation where it would risk administrative insolvency or a last-minute scramble to obtain financing, most likely at worse terms[,]" and (c) denial would provide creditors "leverage over the debtor by impairing its ability to defend against litigation[.]" *Id.* at 74:4-9.[8]

21. Each of the justifications noted by this Court in *MSR Hotels* applies equally here: without approval of the DIP Facility, the Debtor (x) has no ability to finance its restructuring process, (y) faces administrative insolvency, and (z) has no ability to defend against claims nor the ability to preserve its rights with insurers and other parties for the benefit of the Debtor's creditors. Accordingly, this Court should apply similar reasoning here and overrule the Committee's objection on these grounds. It is simply reality that chapter 11 cases are costly and that is why the Debtor has taken unusual and effective steps, with the Court's approval, to minimize unnecessary expenses.

22. *Second*, and relatedly, using proceeds of a postpetition financing (or exit financing proceeds, as requested by the Committee)[9] to compensate survivors does not relieve the Debtor's

---

[8] The Court ultimately denied the financing motion in *MSR Hotels*, but it did so on other grounds, including the debtor's failure to demonstrate that it had sufficiently marketed the proposed loan. *See id*. at 79:16-25.

[9] The Committee is no doubt aware that in any scenario, administrative expenses incurred by the Debtor will need to be paid before any prepetition general unsecured claims and, therefore, delaying the proposed financing does not alter the priority scheme under the Bankruptcy Code.

10

obligation to satisfy administrative expenses. The Debtor's limited resources always presented a zero sum game: the more the Debtor spends on administrative expenses, the less there is for creditor recoveries and vice versa. The DIP Facility, or the stage of the case when it is incurred, does not change the equation. It is still within the Committee's control to minimize the former through a commitment to achieve a speedy resolution, which will provide the Debtor with greater flexibility to maximize the latter.

23. *Third*, the liens on the unencumbered real estate were necessary to obtain the DIP Facility. No lender was willing to provide the Debtor with financing on an unsecured basis and the two lenders that provided commitments, including the DIP Lender, required that any financing be secured by the Debtor's unencumbered real estate assets. But these liens have no effect on a potential resolution with the Committee. As the Committee well knows, the Debtor specifically negotiated terms to enable monetization of certain of the Debtor's owned real property free and clear of the DIP Liens to help fund a compensation trust. Thus, the Committee's existential concerns are red herrings and have no bearing on the business judgment standard that governs approval of the DIP Facility, which the Debtor has easily satisfied.

### B. The Break-Up Fee and Expense Reimbursement Are Appropriate

24. Payment of the Break-Up Fee and the Expense Reimbursement is more than justified as reasonable and necessary costs of administering this chapter 11 case. Summit played a critical role in the Debtor's successful pursuit of the highly favorable DIP Facility from Carver. Obtaining the commitment from Summit enabled the Debtor to continue operating as a going concern by providing assurances that it would have the liquidity it needed, while also allowing the Debtor to continue discussions with Carver. Without the Summit commitment in hand, the Debtor would have continued to incur administrative expenses it had no assurance of paying and would have been forced to consider its liquidation alternatives months ago.

11

25.     At the time the Debtor was negotiating the commitment with Summit, Summit was aware that the Debtor was also in discussions with Carver. Summit was only willing to reserve capital and provide a financing commitment under such circumstances on the condition that if the Debtor pivoted to a Carver financing, then Summit would be protected by the Break-Up Fee and the Expense Reimbursement. Consequently, the Debtor sought approval of the Break-Up Fee and Expense Reimbursement in the Motion, well in advance of its decision to proceed with the Carver financing.

26.     The cost of preserving optionality turned out to be well worth it. *First*, even after accounting for payment of the Break-Up Fee and the Expense Reimbursement, the Debtor is projected to realize cash savings of at least $185,000[10] under the DIP Facility compared to effectuating the Summit facility. Specifically, the Summit facility provided for $385,000 in fees (including the Exit Fee), plus monthly interest payments of approximately $116,875, resulting in total fees and interest of $852,500 over four (4) months. In contrast, under the DIP Facility, the Debtor will incur $220,000 in fees (including the Exit Fee), plus monthly interest payments of approximately $61,875, resulting in $467,500 in fees and interest over four (4) months. *See* Supp. Chiu Dec., Ex. A. Moreover, because the DIP Facility contemplates conversion to an exit facility (without additional fees), the cash savings to the Debtor are likely greater because the Debtor will not have to run another financing process to identify an exit lender, nor incur additional associated fees.

27.     *Second*, because Summit and its counsel expended a significant amount of time and effort negotiating and documenting the Summit facility, including the proposed form of DIP order and a credit agreement, and identifying and remedying title-related matters and property record

---

[10]  These projected savings assume the Debtor emerges from chapter 11 in February 2023. The cash savings increase to $240,000 if the Debtor emerges in March 2023.

12

clarifications with only a small advance from the Debtor, the Debtor was able to leverage those efforts to facilitate fast and efficient documentation of the DIP Facility. Without Summit's involvement, Carver's legal bill would have greatly exceeded the current estimate of $100,000, and therefore the Expense Reimbursement is not merely an incremental expense.

28.    In sum, the Debtor has determined in its reasonable business judgment that the Break-Up Fee and the Expense Reimbursement, less the modest deposit previously advanced, provided a critical benefit to the Debtor's estate and, therefore, payment of these fees and expenses constitute the actual and necessary costs of administering this chapter 11 case. *See In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 790414, at *33 (Bankr. S.D.N.Y. Mar. 15, 2022) ("[T]he allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.") (internal citations omitted); *see also In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) ("This court will approve breakup fees that serve the best interests of the estate and that are otherwise fair."). The Break-Up Fee and the Expense Reimbursement should be approved.

### C. The Remedies Notice Period Is Reasonable and Consistent with Precedent in This District

29.    The Debtor specifically negotiated for the Remedies Notice Period, and submits that the construct in the Proposed DIP Order is standard in financing orders in this district and others. The Debtor required that the DIP Lender agree to the Remedies Notice Period so that if an Event of Default ever occurred, the DIP Lender could not immediately take action, but rather the Debtor would have the opportunity to come back before this Court to dispute whether an Event of Default occurred or that such Event of Default was properly cured (if subject to cure).

13

30.     Oddly, the Remedies Notice Period is providing the very protection that the Committee is seeking through its objection—the DIP Lender cannot enforce its rights before the Debtor first has the opportunity to seek relief from this Court.  Similar remedy notice periods have been approved in numerous cases in this district.  *See, e.g., In re Lumileds Holdings B.V.*, Case No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 13, 2022) [Docket No. 188] (permitting post-petition lenders to exercise remedies against collateral following five business days' termination notice to Debtors, official creditors' committee, and United States Trustee); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. Mar. 18, 2022) [Docket No. 4704] (same); *In re Philippine Airlines, Inc.*, Case No. 21-11569 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2022) [Docket No. 123] (same); *In re Stoneway Capital Ltd.*, Case No. 21-10646 (JLG) (Bankr. S.D.N.Y. July 30, 2021) [Docket No. 198] (same); *In re Evergreen Gardens Mezz LLC*, Case No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) [Docket No. 128] (same).[11]

**Conclusion**

31.     The terms of the DIP Facility and the Proposed DIP Order reflect a heavily negotiated, arm's-length agreement among the Debtor and the DIP Lender that will enable the Debtor to live to fight another day, continue to work with the Committee on a resolution of this case, and safeguard the operation of its charitable mission.  Consequently, the Debtor submits that the Court should overrule the Committee Objection and enter the Proposed DIP Order.

[*Remainder of page intentionally left blank*]

---

[11] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtor's counsel.

14

WHEREFORE, the Debtor respectfully requests entry of the Proposed DIP Order, (a) granting the relief requested in the Motion, (b) overruling the Committee Objection, and (c) granting such other relief as is just and proper.

Dated: November 8, 2022
       New York, New York

Respectfully submitted,

*/s/ Alan W. Kornberg*
Alan W. Kornberg, Esq.
Andrew M. Parlen, Esq.
William A. Clareman, Esq.
John T. Weber, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
akornberg@paulweiss.com
aparlen@paulweiss.com
wclareman@paulweiss.com
jweber@paulweiss.com

*Counsel to the Debtor and Debtor in Possession*