**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

MADISON SQUARE BOYS & GIRLS CLUB, INC.,[1]

Debtor.

Chapter 11

Case No. 22-10910 (SHL)

## DECLARATION OF DANIEL O'BRIEN IN SUPPORT OF
## THE NAVY YARD TRANSACTION AND CONFIRMATION OF THE PLAN

I, Daniel O'Brien, pursuant to section 1746 of title 28 of the United States Code, declare the following to be true and correct, and to reflect my professional opinion and best judgment:

### I.    Background & Qualifications

1.    I am the Executive Managing Director at Cushman & Wakefield Realty of Brooklyn, LLC ("C&W"),[2] where I oversee the Brooklyn Capital Markets team.   In April 2023, C&W was engaged to serve as the Debtor's agent in connection with the sale of the Navy Yard Clubhouse.   C&W is a leading global real estate services firm with over 52,000 employees in 400 offices in 60 countries across the globe.   In New York, C&W has been the leading firm for building sales for 20 consecutive years.   In the last five years, C&W has sold over 600 properties and currently has over 200 listings citywide.   I have held my position at C&W since I joined the firm in 2019.   Prior to joining C&W, I worked at Eastdil Secured, a real estate investment bank, between 2011 and 2019 most recently as a Director (2017–2019).   I received my MBA in Real Estate & Finance from The Wharton School in 2011.

---

[1]    The last four digits of the Debtor's federal tax identification number are 6792.  The Debtor's mailing address is 250 Bradhurst Avenue, New York, New York 10039.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *First Amended Chapter 11 Plan of Reorganization of Madison Square Boys & Girls Club, Inc.* [Docket No. 574] or the *Disclosure Statement for Chapter 11 Plan of Reorganization of Madison Square Boys & Girls Club, Inc.* [Docket No. 466], as applicable.

2.      At C&W, I lead a team of ten (10) people covering the Brooklyn and Queens markets.   In connection with this engagement, I worked closely with my colleague David Lebenstein, who runs C&W's non-profit focused practice.   Mr. Lebenstein and his team work exclusively with non-profit organizations and have sold dozens of assets both to and on behalf of non-profit clients.

3.      I have experience working with non-profit organizations in connection with real estate transactions, and I have brokered multiple transactions on behalf of non-profit organizations, including but not limited to:  St. Francis College ($160M),[3] Diocese of Brooklyn ($8.8M), and New York Botanical Gardens ($12.8M).  I am currently marketing an asset for Riverside Church ($38M).  Outside of the non-profit space, a few recent notable transactions I have worked on include:  The South Brooklyn Lefrak Portfolio ($250M), The Dime Residences in Williamsburg ($157.5M), 12 Metrotech Center in Downtown Brooklyn ($128M), and The Landing in Brooklyn Heights ($90M).  In addition to larger institutional sales, my team also focuses on the sale of middle market real estate assets (*i.e.*, a market value below $50M).

## II.      Navy Yard Transaction

4.      I understand that the Plan contemplates that the Debtor and the Reorganized Debtor, together with C&W, conduct a pre-Effective Date marketing process (the "Marketing Process") to consummate a sale, sale-leaseback, transfer or other monetization transaction of the Navy Yard Clubhouse in accordance with the Committee Settlement (the "Navy Yard Transaction") in consultation with the Committee or the Compensation Trustee, as applicable. I have been advised that, in accordance with the Plan, 100% of the proceeds generated from the Navy Yard Transaction, less all closing costs and brokers' fees, will be contributed to

---

[3]      Unless otherwise indicated, the listed price indicates the final sale price for the asset.

the Compensation Trust for the benefit of Holders of Abuse Claims as part of the Committee Settlement. It is my understanding that the sale of the Navy Yard Clubhouse is a critical and highly negotiated component of the Committee Settlement reflected in the Plan.

## III.   Marketing Process

5.     In furtherance of the Committee Settlement, on April 27, 2023, the Debtor and its advisors commenced an extensive Marketing Process, which included C&W's solicitation of interest from over 28,000 potentially interested parties. The parties solicited include the most active investors, developers, and capital sources in the market. C&W also specifically targeted non-profit organizations that might use the space, institutions that might acquire the space for the gymnasium, and developers of both housing and other uses, including charter schools. C&W also posted the opportunity on all relevant multi-listing websites. Of the potential buyers contacted, seventy-seven (77) investors engaged with C&W and received an offering memorandum, as well as access to additional diligence materials to assist them in formulating their bids.

6.     The Debtor ultimately received fifteen (15) first round bids from interested parties. Following the submission of first round bids, the Debtor and C&W continued to negotiate with various bidders with the aim of increasing the value and improving the terms of the bids received. After about two (2) weeks of constructive dialogue and negotiations, the Debtor received seven (7) "best and final" bids. Following continued discussions with the parties and careful consideration, the Debtor submitted good-faith counterproposals, and the Debtor subsequently received four (4) responses to its counterproposals and solicited forms of purchase and sale agreements from each of those parties.

7.     The Debtor spent approximately four (4) weeks engaging in good-faith, arm's-length negotiations with the four (4) remaining interested parties over the terms of the respective

purchase and sale agreements. Following extensive discussions with C&W, the Debtor, in consultation with its legal and financial advisors and the Committee and its advisors, and upon approval of the Board, determined that the form of *Purchase and Sale Agreement* by and between the Debtor and 240 Nassau Street, LLC (the "Purchaser"), a copy of which is attached as Exhibit A to the *Notice of Filing of Purchase and Sale Agreement* [Docket No. 594] (the "PSA"), represents the highest or otherwise best offer available for the Navy Yard Transaction.

8.     In my view, the Marketing Process established an appropriate process to market test the value of the Navy Yard Clubhouse in light of the circumstances of the Chapter 11 Case, and was the best means for establishing a fair and reasonable value for the Navy Yard Clubhouse. The approximately three-month process effectively balanced the need to run a robust but efficient process while also delivering timely recoveries to Abuse claimants in accordance with the Committee Settlement contemplated by the Plan. Based on my experience, the Marketing Process generated a high degree of interest and participation, which resulted in multiple qualified bids.

9.     The Marketing Process was also designed and conducted with the Debtor's stakeholders in mind—namely, the Marketing Process was intended to maximize the value of the Navy Yard Clubhouse for the benefit of Holders of Abuse Claims while also advancing the Debtor's charitable mission. I believe the PSA accomplishes both of these goals. In evaluating the bids submitted by parties in interest, the Debtor considered a number of factors including, but not limited to, the purchase price, the projected use of the property, and whether such projected use would further the Debtor's charitable mission and the interests of the community. At least one interested party submitted a bid that reflected a higher purchase price than that of the Purchaser; however, the Debtor, in consultation with the Committee, ultimately determined to select

4

the Purchaser as the successful bidder due, in part, to its commitment to working with the community, developing affordable housing on the site, and incorporating a multi-use community space in the future development. The Purchaser has also expressed a willingness to collaborate with members of the Navy Yard community in developing the multi-use community space.[4]

10.     Furthermore, the PSA and the related documents were negotiated in good faith and at arm's-length. As the Marketing Process continued, C&W updated and increased its pricing guidance to interested parties. As a result of the process pursued, the base purchase price reflected in the Purchase Agreement is approximately $2 million higher than the leading purchase price submitted through the first round of bids. It is telling that the Committee, the constituency representing the Holder of Abuse Claims who will receive the proceeds of the Navy Yard Transaction, consents to and supports the consummation of the Navy Yard Transaction on the terms set forth in the PSA.

11.     In my opinion, the Debtor's decision to enter into the PSA and consummate the Navy Yard Transaction provides material value directly to the Holders of Abuse Claims, and is in the best interest of the Debtor and its Estate, creditors, and other parties in interest. I believe the Debtor has used its best efforts to obtain the highest or otherwise best bid for the Navy Yard Clubhouse under the circumstances. Notably, consummation of the Navy Yard Transaction pursuant to the PSA will enable the Debtor to maximize value for Holders of Abuse Claims and continue to provide vital services to children throughout New York City.

*[Remainder of page intentionally left blank.]*

---

[4]     The PSA provides for a purchase price of $15 million with an additional upside in the event an application for rezoning of the property is approved within three (3) years of the closing of the Navy Yard Transaction. If such application is approved, the Purchaser will provide additional consideration equal to the New Floor Area Increase (as defined in the PSA) resulting from the rezoning multiplied by $12 per square foot.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2023                                        */s/ Daniel O'Brien*

Daniel O'Brien